R & R CONSTRUCTION CO., Plaintiff-Appellant, *v.* JUNIOR COLLEGE DISTRICT NO. 529, OLNEY, Defendant-Appellee.

Fifth District    No. 75-451

Opinion filed November 30, 1977.

Hoagland, Maucker, Bernard & Almeter, of Alton (James K. Almeter and Al Pranaitis, of counsel), for appellant.

Laurence L. Arnold, of Olney, for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

Plaintiff, R & R Construction Company (R & R), brought suit against Junior College District No. 529 (College District), the defendant, seeking additional compensation for a particular earthwork operation which it claimed was an extra to a construction contract between the parties. The claimed cost of the extra was $113,978.45. Following a bench trial in the circuit court of Richland County, the court found, *inter alia,* that this work was not an extra and entered judgment in favor of defendant. R & R appeals to this court.

The only issue on appeal is whether the use of a lime soil stabilization process upon excavated areas was an extra for which R & R is entitled to additional compensation in excess of its bid for the construction project.

■■ R & R has made motion in this court for leave to amend its complaint in order to conform the pleadings to the evidence; the College District has filed objections, and we have taken the motion with the case. The proposed amendment would clarify the point that the work for which claim is made is the lime soil stabilization process and that it was utilized in areas of the parking lots, plazas, and sidewalks which were in excavation, rather than merely in the main parking lot. Since our decision in this case renders valueless a granting of the motion, we deny plaintiff's motion to amend its complaint.

In 1971 the College District solicited bids from various general contractors for the construction of a building and various site developments, including a parking lot, roadways and walkways. R & R was the successful bidder and the parties entered into a written contract for the construction project in the latter part of 1971. This project was the first phase of construction of college facilities for Olney Central College.

In order to supply a framework for the understanding of the factual context of this case, we initially detail some information relating to construction work which we have gleaned from the evidence of record. Whenever buildings or paved areas are constructed, it is imperative that

the soil beneath these improvements be of a suitable density to support them and to avoid damage to the improvement by shifting or settling of the soil. If the soil does not meet the density requirement deemed suitable by the architect or engineer the contractor endeavors to compact or compress the soil until it is properly dense. The most common method to achieve compaction is to use roller equipment on the soil. Depending on the topography of the land, the soil base or grade beneath any improvement is reached either by excavating down to a desired elevation or by filling in soil up to an elevation. Generally speaking, serious compaction problems are encountered more often in areas that are in fill as opposed to in excavation since the earth beneath an excavation is in its natural state and tends to be more dense than fill soil.

The contract specifications in this case required a maximum density of 95% at optimum moisture of all soil under building slabs and paved areas regardless of whether the grade was achieved by excavation or filling. The subgrade soil under excavated areas was specifically required to exhibit this density in the top 12 inches.

Apparently as its first operation in this project, R & R removed the top soil and existing vegetation from the area designated to be the main parking lot and stockpiled it for future use. This was done in late 1971. In the summer of 1972 part of the parking lot area was graded or excavated to a depth of 12 inches. R & R attempted to compact this soil to the density requirements of the contract for soil beneath paved areas by use of a disk and a "sheepsfoot" roller. These attempts were unsuccessful.

Again in the spring of 1973, R & R attempted, unsuccessfully, to achieve the required compaction by use of conventional compaction equipment (disk and rollers). It was determined that the problem was excessive moisture. According to testimony at trial, in order to achieve the desired density by compaction the moisture content of the subgrade soil needed to be in the range of 11 to 13%. Soils expert John Mathes testified in rebuttal for plaintiff that the moisture content encountered was in the range of 28 to 30%.

After discovering this problem several letters were exchanged between R & R and the architect-planner about the difficulty. The College District was apprised of the problem by copies of these letters. The architect's position was that this soil was indeed compactible; however, further attempts to compact it by rolling revealed that the required density could not be readily achieved by this method due to the high moisture content.

In July of 1973 architect job representative, William Jarvis, directed R & R construction manager, Howard Peters, Jr., to consult a soils expert to determine what methods would be necessary to compact the material and to get the work done. Mr. Peters consulted soils expert Jack Faggetti. Utilization of Mr. Faggetti seemed particularly appropriate since he was

familiar with the site and its soils, having already taken tests and provided advice to defendant's architect. Mr. Faggetti recommended use of lime on the soil as a drying agent so that compaction could proceed and be accomplished before the arrival of winter necessitated delay of the work until the following year.

R & R's Mr. Peters testified that he and architect representative Mr. Jarvis discussed at some length whether the use of this process on the excavated areas was extra work for which plaintiff should receive additional compensation. The architects maintained that it was not extra work but rather within the contractor's obligations, and refused to approve a change order. Mr. Peters further testified that he informed E. Kenton Peak, a College District representative, that he believed the work was an extra although the architects refused to consider it as such.

R & R proceeded with the lime process and was subsequently able to achieve the density required. The process was relatively simple. Hydrated lime was spread over the soil and worked into it by use of several pieces of equipment, including one called a Seaman pulverizer. The pulverizer works similarly to a garden tiller, except on a larger scale. It stirred up the soil and mixed in the lime. It is this work which R & R claims is an extra and for which it seeks the instant monetary award.

■■ For a contractor to recover additional compensation from an owner for extra work, the contractor must prove the following essential elements: (a) the work was outside the scope of his contract promises; (b) the extra items were ordered by the owner; (c) the owner agreed to pay extra, either by his words or conduct; (d) the extras were not furnished by the contractor as his voluntary act; and (e) the extra items were not rendered necessary by any fault of the contractor. (*Watson Lumber Co. v. Guennewig*, 79 Ill. App. 2d 377, 226 N.E.2d 270; *Bulley & Andrews, Inc. v. Symons Corp.*, 25 Ill. App. 3d 696, 323 N.E.2d 806; *Mayer Paving & Asphalt Co. v. Carl A. Morse, Inc.*, 48 Ill. App. 3d 73, 365 N.E.2d 360.) The proof that the items are extra, that the defendant ordered it as such, agreed to pay for it, and waived the necessity of a written stipulation, must be by clear and convincing evidence. *Watson Lumber Co. v. Guennewig.*

After carefully considering the evidence presented at trial, the contract documents and the applicable principles of law, we conclude that R & R has failed to prove that the lime process was outside the scope of its contract promises and therefore extra.

R & R's argument at trial and before this court as to this being extra work is centered upon the specific enumeration of compaction methods and compaction aids found in sections 220.5 and 220.6 of the Earthwork portion of the contract specifications, respectively entitled Excavation and Fill and Compaction. A portion of section 220.5, dealing with

excavation for paved areas, building slabs and foundations, states that if the subgrade soil does not meet the density requirement of 95% to a depth of 12 inches, "the subgrade shall be compacted by proof-rolling or by the use of suitable compaction equipment to obtain the density specified."

Section 220.6 directs that each layer of *fill* should be compacted with approved equipment to achieve the required density and subsequently provides, "In lieu of drying by manipulation of soil containing excessive moisture, the Contractor may employ hydrated lime or monohydrated lime or similar beneficial ingredients to reduce the moisture content, * * *."

R & R argues that it is clear from the language of these provisions that the use of the lime soil process was not contemplated with respect to compaction of subgrade soil but only with respect to fill soil. Consequently, R & R concludes that its only contract obligation with respect to these excavated areas was to compact the subgrade soil by use of rollers and that the lime work was therefore extra. We believe that this view involves a fundamental misconception as to what R & R's contractural promise was with respect to subgrade soil.

■■ Its fundamental obligation was to do what was necessary to get this soil to the proper density for the placement of improvements thereon. The specifications required proof-rolling or use of suitable compaction equipment if the subgrade soil did not meet the contract's requirement. This, we believe, was a minimum and nonexclusive requirement. The specification directs what *must* be done but leaves to the contractor's discretion what methods should be used to supply the required soil density if the soil should still be unsuitable after employing the above compaction methods. R & R was obligated to do what was necessary to bring the soil up to the contract's requirements.

Labor and materials which are incidental and necessary to the execution of the contract generally cannot be regarded as extras for which the builder may recover. (17A C.J.S. *Contracts* §371(6), at 412 (1963).) The cost of this lime process is not recoverable since it was incidental and necessary to R & R's meeting the contract's subgrade soil density requirement.

This cost allocation is supported by the general conditions of this contract. In pertinent part, General Condition 2(d) defines "Work" as:

> "All obligations undertaken by the Contractor pursuant to the Contract Documents. Work includes, but is not limited to, the furnishing of all material, labor, equipment, supplies, plant, tools * * * and all other services, facilities, and expenses necessary for the full performance and completion of the requirements of the Contract Documents."

General Condition 5(a) provides:

"It is understood that except as otherwise specifically stated in the Contract Documents, the Contractor shall provide and pay for all materials, labor, tools, equipment, * * * and all other services and facilities * * * necessary to execute, complete and deliver the Work within the specified time."

As the court in *Watson Lumber Co. v. Guennewig*, 79 Ill. App. 2d 377, 393, 226 N.E.2d 270, 278, noted:

"It is clear that the contractor does not have the right to extra compensation for every deviation from the original specification on items that may cost more than originally estimated. The written contract fixes the scope of his undertaking. It fixes the price he is to be paid for carrying it out. The hazards of the undertaking are ordinarily his. [Citation.]"

See also *North Shore Sewer & Water Co. v. Corbetta Construction Co.* (7th Cir. 1968), 395 F.2d 145; 6 Corbin, Contracts §1333, at 365-67 (1962); *City of East Peoria v. Colianni & Dire Co.*, 334 Ill. App. 108, 115, 78 N.E.2d 806.

Plaintiff next contends that the evidence established that the extra work was ordered by defendant and that defendant agreed to pay extra for it by its words or conduct.

As already noted, the evidence shows that Mr. Jarvis, the defendant's architectural representative, told R & R's construction manager to consult with a soil expert concerning how to achieve compaction and to get the work done. However, the record also shows that although Jarvis knew that R & R was going to follow Jack Faggetti's suggestion to use a lime process, the defendant's architects and R & R were in complete disagreement about whether this was extra work. Defendant by these words and conduct may have ordered to be done whatever the expert believed was necessary to achieve compaction; however, there is no doubt that it made clear to the plaintiff that it was not agreeing to pay any additional compensation. Defendant consistently maintained that the lime process was not an extra.

■■ The general conditions of this contract provided that no claim for extra work or materials would be allowed unless the work was ordered in writing by the defendant or its architect, acting officially for defendant. The price was also required to be stated in the order. This type of contract clause is enforceable since the owner has a right to control his liabilities and to be protected against the contractor voluntarily going ahead with extra work at his expense. (*Watson Lumber Co. v. Guennewig.*) Since, however, the requirement of a written stipulation covering extras is for the benefit of the owner, an owner, by his conduct, may waive the protection afforded by the provision and become liable for

extras verbally ordered. (*Strom v. Lipschultz*, 5 Ill. App. 3d 308, 282 N.E.2d 257; *Watson Lumber Co. v. Guennewig.*) The plaintiff contends that defendant's conduct here shows such a waiver. We disagree.

We have examined the cases cited by plaintiff on this issue and find the following comments of the court in *Watson Lumber v. Guennewig*, 79 Ill. App. 377, 395-96, to be appropriate:

> "In all the cases finding that such a provision had been waived thus allowing a contractor to collect for extras, the nature and the character of the item clearly showed it to be extra. Also, in most cases the owner's verbal consent of request for the item was clear beyond question and was proven to have been made at the time the question first arose while the work was still to be finished."

■■ In contrast, in this case there was a serious question whether the lime process was extra. The agents of the College District vehemently maintained that the process was not an extra and refused to issue a change order covering the work, thereby authorizing additional compensation. "The defendants' refusal to give a written order has in itself been held to negative the idea of a waiver of the contract requirement for a written order. F. W. Carlin Const. Co. v. New York & Brooklyn Brewing Co., 149 App. Div. 919, 134 NYS. 493." (*Watson Lumber Co. v. Guennewig*, 79 Ill. App. 2d 377, 396; See also, *G. Dale Van Leeuwen & Sons, Inc. v. Kaufman & Broad Homes, Inc.*, 7 Ill. App. 3d 380, 287 N.E.2d 329 (abstract).) In light of this evidence, we conclude that R & R failed to prove a waiver of the writing requirement by clear and convincing evidence.

R & R argues further that when defendant refused to issue a change order for the lime process it breached a general condition of the contract which, if honored, would have obligated the College District to pay the additional compensation. The provision is General Condition 21 which reads in pertinent part as follows:

> "Should the Contractor encounter *subsurface and/or latent conditions at the site materially differing from those shown on the Drawings * * *,* he shall immediately give notice to the Architect/Engineer of such conditions before they are disturbed. *The Architect/Engineer will thereupon promptly investigate the conditions, and if he finds that they materially differ from those shown on the Drawings * * * he will at once make such changes in the Drawings * * * as he may find necessary, any increase or decrease of cost resulting from such changes shall be adjusted in the manner provided in Paragraph 17 of the General Conditions.*"
> (Emphasis added.)

R & R maintains that the high moisture content encountered in this case was a subsurface condition which materially differed from that shown in

the soil borings logged on the drawings since none of these borings were from the parking lot area. Thus, defendant should have issued a change order permitting payment for the increased cost.

The question of whether a material difference in subsurface conditions existed is also pertinent, because, if the moisture conditions were not discoverable prior to bidding, it would be unfair to place the greater cost burden for achieving compaction on the contractor as being incidental and necessary to the execution of the contract. See generally 6 Corbin, Contracts §1333, at 365 *et seq.* (1962).

■■ After examining the record, we conclude that the moisture contents encountered in the excavated areas which necessitated the lime drying process were not subsurface conditions "materially differing from those shown on the Drawings."

As a bidder, R & R had a copy of all the components which comprised the contract documents for this project for use in determining what figure to submit as its proposed bid. One of these components was the drawings. Two pages of the drawings were devoted to information from the testing of 10 soil borings made on the site by Dr. Robert Morse. Although only two of these 10, borings one and two, showed moisture content, those two were representative of the rest of the borings. Borings one and two showed moisture contents of 25% and 23% respectively at a depth of two to three and a half feet. Considering that moisture content in the range of no more than 11% to 13% was necessary to achieve 95% density, we believe the encountered moisture contents of 28% to 30% cannot be realistically viewed as "materially differing" from readings of 23% to 25% so as to justify a change order and increased compensation over R & R's bid.

In view of the testimony of plaintiff's construction manager Mr. Peters that the soil in the parking lot was generally the same as in the area of borings one and two and that he was aware of the moisture content in those borings before submitting plaintiff's bid, it is not significant that borings one or two might not be from the parking lot. In addition, the passage of time from pre-bidding testing until the discovery and solution of the problem was not apparently significant either. Plaintiff's soils expert Mr. Faggetti testified that there was no appreciable difference in the moisture content of this soil from 1969 through 1973. We are compelled to conclude that the instant moisture and compaction problem was foreseeable from the information given to R & R prior to submission of its bid.

Moreover, the moisture problem could have been further confirmed had R & R availed itself through defendant's architect of the record of other test borings and the subsurface exploration reports as directed by Specification 220.1 (lines 25-30). The 16 borings of the Foundation Investigation revealed moisture contents of 19% to 33% at a depth of two

feet. Fully one half of those showing a moisture content at this depth were in the range of 25% to 33% water. Further, a perusal of the Terrain Investigation would have revealed that the engineering-geologist, Dr. Morse, had to locate borings at places from which the drilling rig could be extricated rather than at the most useful locations.

The only other element of proof of the *Watson Lumber* test for recovery of extras which involved a serious dispute was whether the extra work was rendered necessary by any fault of the contractor. In view of our conclusions as to the above requirements, it would only serve to lengthen this opinion to address this question. This we decline to do.

For the foregoing reasons, we affirm the judgment of the circuit court of Richland County in favor of defendant College District.

Affirmed.

G. J. MORAN and EBERSPACHER, JJ., concur.