BERG AND ASSOCIATES, INC., Plaintiff-Appellee, v. NELSEN STEEL AND WIRE COMPANY, Defendant-Appellant.

First District (5th Division)   No. 1—90—1475

Opinion filed May 10, 1991.

Bedell A. Tippins and Catherine A.T. Nelson, both of Keck, Mahin & Cate, of Chicago, for appellant.

Ronald N. Primack, of Lansing, for appellee.

JUSTICE MURRAY delivered the opinion of the court:

On or about October 20, 1979, defendant, Nelsen Steel & Wire Company (Nelsen), and plaintiff, Berg & Associates, Inc. (Berg), entered into an oral contract. On May 3, 1990, following a bench trial, the trial court entered a judgment against Nelsen in the amount of $150,000. Nelsen appeals the final order entering judgment.

The facts are as follows.

In October 1979, Nelsen and Berg entered into a verbal agreement whereby Berg was to serve as a construction manager for Nelsen in connection with the construction of a restaurant and small assembly facility known as "Scandals." The restaurant and facility were to occupy three acres of a nine-acre parcel of property owned by Nelsen on Hilton Head Island. Albert Berg testified that he sent Nelsen an ASIA "Standard Form of Agreement Between Owner and Construction Manager," which contained the terms of the agreement Berg and Nelsen had worked out in late September. Nelsen acknowledges receipt of a copy of the ASIA contract.

Nelsen engaged the services of an architect to prepare the plans and drawings. Nelsen also entered into a contract with Austin Construction Co. to serve as general contactors. Work on the project commenced in November 1979, and the facility was allegedly completed in

April of 1980. Commencing with the construction of Scandals in November 1979, Berg submitted invoices for construction management services to Nelsen on a monthly basis. On July 31, 1980, Berg submitted its "final invoice for construction management services." There is no dispute that the billings through this "final invoice" were paid.

Richard Berg and Albert Berg III testified that from January 1981 through March 1981, they worked on the site plan for the Phase II development of Nelsen's nine-acre parcel on Hilton Head Island. Albert Berg, Jr., testified that he presented the site plan to Dan Nelsen at his offices on April 25, 1981. Albert Berg III testified that he met with Mr. Goode at their offices to review the site plan. Both Albert Berg, Jr., and Albert Berg III testified that at that meeting they were instructed by Dan Nelsen to go ahead and start working drawings for Phase II, based on the site plan. Albert Berg, Jr., testified that they discussed the schedule of construction, costs involved, and a rough budget based on 60 condominiums at a cost of $100,000 each.

Dan Nelsen testified that the Bergs' testimony regarding the April 1981 meeting was absolutely false and at no time did they talk about building condominiums on the property. Dan Nelsen denied authorizing Albert Berg, Jr., to undertake any activities on behalf of Nelsen with respect to condominiums on the Hilton Head property.

Clifford Nelsen testified that he recalled meeting with Albert Berg with respect to the Hilton Head Island investment in the early summer of 1981. The meeting took place at Nelsen's offices, and Albert Berg and Ed Goode were in attendance. He remembers being shown the site plan and that it had been presented as an example of what could be done with the property. At this meeting Mr. Berg and Mr. Goode did not indicate in any way that they were interested in acquiring the property. However, at a subsequent meeting, probably in midsummer, Mr. Berg and Mr. Goode indicated that they wanted to be the buyers of the property, having formed a group called Southern Pines. Clifford Nelsen further recalls receiving invoices from Berg in the amount of $150,000. He did not recall the date of the bill, but recalled that Nelsen received the bill years after the services.

Testifying on behalf of Nelsen, Mr. Goode testified that he did not recall any invoice in 1981 or 1982, and that the first invoice he recalls was one he saw approximately three to four months before suit was filed. Further, Ed Goode testified that no meeting between Albert Berg, Jr., Albert Berg III, Dan Nelsen and himself ever took place.

Albert Berg testified that Berg submitted its initial billing to Nelsen in July 1981, billing Nelsen for $1,800 for a site plan, and for 75% of the design phase of his management for the working drawings

which had been completed to that date. Albert Berg further testified that after Ed Goode, Nelsen's controller, explained to him the circumstances at Nelsen, and told him that he would be paid when the funds were available, Berg accepted that arrangement and continued to work for Nelsen, both on the working drawings for Phase II and for on-going additional work. The on-going additional work included work on additional punchlists, dance floor repairs and supervision, work on answers to interrogatories in a lawsuit, cleanup supervision, inventory and sewer application documentation. In April 1982, Berg submitted its invoice for $150,000, representing an additional $80,700 for 97% completion of the design phase, 8% of the construction phase for the work involved in getting the permits in place for the project, and the additional work for the Scandals property.

On July 1, 1987, Berg filed a suit charging Nelsen with a breach of a written contract. Berg sought to recover damages in the amount of $150,000. Although Berg attached a copy of a written contract to the complaint, it is undisputed that the contract was never signed by Nelsen. A bench trial followed during 1990. At the end of Berg's case in chief, Nelsen moved for a directed verdict based on the statute of limitations. Nelsen's motion for a directed verdict was denied. The trial court found in Berg's favor and entered judgment in the amount of $150,000. This timely appeal followed.

On appeal Nelsen presents the following issues for review: (1) whether the trial court erred in denying defendant's motion for a directed verdict based on the expiration of the five-year statute of limitations; (2) whether a reversal is required where a material variance exists between the pleading and the proof; (3) whether the court's ruling of $150,000 in favor of Berg is against the manifest weight of the evidence; and (4) whether Nelsen is entitled to a new trial where the record, considered in its entirety, illustrates that Nelsen was denied a fair and impartial trial on the merits.

I

The first issue Nelsen raises is whether the trial court erred in failing to direct a verdict based on the expiration of the five-year statute of limitations pursuant to section 13—205 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 13—205). Nelsen claims the breach occurred no later than May 30, 1982, triggering the five-year statute of limitations applicable to oral contracts. Since Berg's suit was not filed until July 1, 1987, Nelsen claims the suit is time barred, having been filed some 30 days after the expiration of the statute.

■ The statute of limitations begins to run when a party to be barred has the right to invoke the aid of the court and to enforce his remedy. April 30, 1982, was admittedly the date of the final statement; however, Berg argues that in construction contracts, the undertaking of a contractor is a single endeavor and the statute of limitations does not begin to run until the completion of that endeavor. Berg is correct in this regard. In cases involving construction contracts, the courts of Illinois have recognized an exception to the rule that statutes of limitations begin to run on the due date of the monetary installments due on the contract. (*Santucci Construction Co. v. City of Danville* (1984), 128 Ill. App. 3d 954, 956, 471 N.E.2d 1000, 1001.) Illinois courts have viewed such contracts as a single endeavor and have held that the statute does not begin to run until the endeavor is complete. *O'Brien v. Sexton* (1892), 140 Ill. 517, 30 N.E. 461; *Santucci Construction Co. v. City of Danville* (1984), 128 Ill. App. 3d 954, 471 N.E.2d 1000.

■ Applying this exception to the facts of this case, we must reject Nelson's contentions as to the tolling of the statute of limitations. The record reflects evidence that Berg provided supervisory cleanup work as late as November 1982. In light of this, we determine that the trial judge was correct in denying Nelsen's charge that Berg's claim was time barred by the statute of limitations.

## II

The second issue Nelsen raises is that a fatal variance exists between pleading and proof. As reflected in the statute of limitations' issue, Berg's proof related to extra work it performed under the contract. Nelsen claims that this is a fatal variance requiring a reversal of the matter. The complaint in the instant case alleges in relevant part:

"3. On or about October 20, 1979, Berg and Nelsen entered into a written contract, a copy of which is attached hereto, and made a part of this Complaint as Exhibit A (consisting of ten (10) pages).

4. By the terms of the contract, Berg was to be paid by Nelsen as a construction manager regarding property known as the Shipyard Commercial Area at Hilton Head Island, South Carolina.

5. Berg did all of the work called for by the terms of the contract in a good, expert and professional manner, including the design phase of the project and the construction phase.

6. Berg's work consisted of:

1. Hired architect and secured land.

2. Assisted in design and development of working drawings for a building known as Scandals.

3. Obtained contractors and suppliers; issued contracts and supervised construction.

4. Prepared and approved payouts to suppliers and contractors.

5. Prepared punchlists and all closing documents.

6. Continued development of property by preparing working drawings for 60 condominium project.

7. Submitted development plans to Hilton Head architectural review board.

7. \*\*\*

8. The work was done between October 1979, and April 30, 1982. Attached hereto as Exhibit B and made a part of the Complaint is a bill."

The first five items of "work," as described in Berg's complaint, regard work done relating to Scandals and are further expressed in the alleged written contract attached to the complaint. Nelsen claims items 6 and 7, however, regard specific "extra" work not included in the original alleged written agreement for Scandals. Berg further alleges that it "has submitted bills to Nelsen for this work but defendant refuses to pay despite many demands by plaintiff."

The extra or additional work Berg allegedly performed included: obtaining sewer allotments; inventory of missing items; cleanup of the property; additional punchlists; and rendering professional services in another legal action. Berg introduced evidence of 642 hours of work, billed at $50 per hour. Nelsen asserts that this alleged work is not described in, referred to, or even hinted at in Berg's complaint. Berg asserts that these 642 hours are included in the April 30, 1982, invoice for $150,000, for which it seeks judgment.

Nelsen asserts that Berg's failure to mention these 642 hours anywhere in the complaint (including any reference on an invoice) creates a material variance between the pleading and the proof in the instant case. Further, Nelsen claims that this fatal variance so prejudiced Nelsen in effectively defending itself that a reversal of the matter is warranted.

Conversely, Berg argues that no variances exist in this case, the action having started as a breach of contract action; the action having been tried as a breach of contract action; and the fact that the action was judged as a breach of contract action. Berg claims that at all times Berg asserted that it was seeking recovery for Nelsen's breach of contract, *i.e.*, Nelsen's failure to pay the bill submitted to it for the

work performed by Berg. Berg asserts that the work was specifically described and authorized by the contract, and can be included within the allegations that Berg performed the duties required by the contract by obtaining contractors and suppliers, issuing contracts, supervising construction, preparing punchlists and continuing development of the property.

■ An objection on the ground of variance between the pleadings and proof must be made in the trial court in order to preserve the question for review. (*Van Hoorebecke v. Iowa Illinois Gas & Electric Co.* (1944), 324 Ill. App. 88, 57 N.E.2d 652.) Nelsen properly objected to the alleged variance between the proof and the pleadings in the trial court; thus, the issue is properly before this court.

■ ■ "A material variance between [a] contract pleaded and [a] contract proved generally precludes recovery." (*Heavey v. Ehret* (1988), 166 Ill. App. 3d 347, 353, 519 N.E.2d 996, citing *Metal v. Gamm* (1931), 262 Ill. App. 140.) The issues in a case are created by pleadings and allegations, to which proof must correspond, and thus, a party cannot have relief based on proof without allegations. (*Morris v. City of Chicago* (1985), 130 Ill. App. 3d 740, 744, 474 N.E.2d 1274.) An adequate complaint based on breach of contract must allege the evidence of a contract, plaintiff's performance of all contractual conditions required of him, facts of defendant's breach and the existence of damages as a consequence thereof. (*Bartlett Bank & Trust Co. v. McJunkins* (1986), 147 Ill. App. 3d 52, 61, 497 N.E.2d 398, 405.) Exhibits attached to the complaint constitute part of the pleading for all purposes. *McCormick v. McCormick* (1983), 118 Ill. App. 3d 455, 455 N.E.2d 103.

■ ■ However, for a variance to constitute reversible error, it must be shown to be material; the one urging it as a basis for relief must show how it worked to his prejudice. (*People ex rel. Adams v. Sanes* (1968), 41 Ill. 2d 381, 386, 243 N.E.2d 233; *Stevenson v. Meyer* (1957), 10 Ill. 2d 335, 139 N.E.2d 740.) In Illinois a variance between the allegations of a complaint and the proof is not fatal unless it misleads an adverse party to his prejudice. (*Cummings v. Dusenbury* (1984), 129 Ill. App. 3d 338, 472 N.E.2d 575.) This was a contract under which Berg was to act as manager of a construction project. Berg pled a breach of that contract, referred to the contract and the bills in the complaint and attached as exhibits to the complaint a copy of the written contract and copies of the alleged unpaid bills. By attaching a copy of the written contract as an exhibit to the complaint, the contract constituted a part of the pleadings for all purposes. Thus, we find Nelsen had sufficient knowledge that Berg was suing on the

terms of the written contract. Nothing in plaintiff's brief or the record indicates that Nelsen was misled by Berg's evidence of extra work under the contract. Although the pleadings could have been more explicit, we do not find that a fatal variance existed between the pleadings and the proof in this case.

## III

Nelsen next argues that the $150,000 verdict in Berg's favor is against the manifest weight of the evidence. Nelsen bases this claim on the fact that all of Berg's claims were for extra work not within the terms of the original agreement. Nelsen claims that under Illinois law, in order to recover for extra work not provided for in the original agreement, Berg must prove that: "(a) the work was outside the scope of the contract premises; (b) the work was ordered by Nelsen; (c) Nelsen agreed to pay for the work by his words or conduct; (d) the work was not furnished by Berg as a voluntary act; and (e) the work was not rendered necessary by any default of Berg."

Nelsen's statement is a correct statement of Illinois law on the question of extra work under a construction contract. The following are the essential elements a contractor must prove in order to recover additional compensation from an owner for extra work: (a) the work was outside the scope of his contract promises; (b) the extra items were ordered by the owner; (c) the owner agreed to pay extra, either by his words or conduct; (d) the extras were not furnished by the contractor as his voluntary act; and (e) the extra items were not rendered necessary by any fault of the contractor. (*R & R Construction Co. v. Junior College District No. 529* (1977), 55 Ill. App. 3d 115, 118, 370 N.E.2d 599, 602; *Mayer Paving & Asphalt Co. v. Carl A. Morse, Inc.* (1977), 48 Ill. App. 3d 73, 77, 365 N.E.2d 360, 363.) "The proof that the items are extra, that the defendant ordered it as such, agreed to pay for it, and waived the necessity of a written stipulation, must be by clear and convincing evidence." (*R & R Construction Co. v. Junior College District No. 529*, 55 Ill. App. 3d at 118, 370 N.E.2d at 602.) A party sustains this burden whereby he shows that the extra work was requested and there is no evidence indicating that the work was necessitated by the party's fault or that the work was performed voluntarily. (*Delta Construction, Inc. v. Dressler* (1978), 64 Ill. App. 3d 867, 381 N.E.2d 1023.) Further, even if a building contract provides for written modification only, an owner may be estopped to raise such issue or waive such provision if such a provision has been waived by the actions or words of the parties. *Delta Construction, Inc. v. Dressler* (1978), 64 Ill. App. 3d 867, 381 N.E.2d 1023; *Capital*

*Plumbing & Heating Supply Co. v. Snyder* (1971), 2 Ill. App. 3d 660, 275 N.E.2d 663.

Nelsen concedes that all the work for which Berg claims $150,000 was outside the scope of the original contract agreement, but claims that this first requirement for recovery is the only element which Berg can satisfy. Nelsen argues that the evidence introduced by Berg fails to satisfy its burden with regard to recovery concerning not only the working drawings, but each and every category of extra work alleged by Berg although not pled in its complaint. However, based on the aforementioned rules of law relating to a party's right to recover for extra work performed on a construction site, we must affirm the decision of the trial judge.

Berg filed a complaint seeking damages for breach of contract. The essential allegations of the complaint were that Nelsen and Berg had entered into a written contract (Berg concedes that the contract was never signed by Nelsen); that from October 1979 to April 30, 1982, Berg did all the work called for by the terms of the contract in a good, expert and professional manner; that Nelsen had been billed, but refused to pay; and that demand for payment had been made upon Nelsen repeatedly. A prayer for relief in the sum of $150,000 was also included.

First, Nelsen concedes that the work Berg performed was outside the scope of his original agreement with Nelsen. Secondly, the evidence disclosed that the construction of the club was completed in April 1980. After completion of the work, according to Albert Berg's testimony, he was directed by Mr. Goode, Nelsen's controller, to provide additional services at the agreed upon rate of $50 per hour. Albert Berg testified to the following hour allotments of work: 100 hours on punchlists; 300 hours on dance floor repairs and supervision; 40 hours on lawsuit answer/research; 16 hours on cleanup supervision; 96 hours on inventory; and 90 hours on sewer application documentation.

Further, Nelsen argues that why, after billing Nelsen on a monthly basis and receiving prompt payment in return, Berg would wait until April 1982, to invoice Nelsen for work it allegedly performed in April 1980. The record reflects that Berg's billing pattern changed from every month to every two years. Albert Berg testified that after Mr. Goode explained to him the circumstances at Nelsen, and told him that he would be paid when the funds were available, Berg accepted that arrangement and continued to work for Nelsen.

■■■ The practice of architecture includes the offering or furnishing of professional services such as construction documents consisting

of drawings and specifications. (Ill. Rev. Stat. 1987, ch. 111, par. 1305.) Albert Berg, as well as his two sons, the alleged preparers of the working drawings, each testified that they were not licensed to practice architecture in the State of Illinois. Nelsen argues that in contravention of the statute, Berg purported to offer and furnish working drawings for a 60-unit condominium complex and now seeks payment for such. The record reflects that Albert Berg and his two sons were questioned at trial as to their qualification to practice architecture. Nelsen further argues that Berg's attempts to now recover for its unlawful practice of architecture are clearly against the public policy of this State. Berg argues that the lack of a license to practice architecture should not be considered by this court because the issue was not before the trial court. We agree; although Nelsen questioned the Bergs as to their qualifications to practice architecture, the argument that Berg could not recover for the drawings because he is not an architect was not raised before the trial court. Questions not raised in the trial court cannot be raised for the first time on appeal and are deemed waived. *George W. Kennedy Construction Co. v. City of Chicago* (1986), 112 Ill. 2d 70, 77, 491 N.E.2d 1160.

Finally, Nelsen asserts that even if this court were to consider the entirety of Berg's evidence at trial as true and competent, the trial court's judgment in favor of Berg in the amount of $150,000 is against the manifest weight of the evidence. Nelsen argues that there are inconsistencies in the evidence presented by Berg, and that Nelsen has not received credit for all payments made by Nelsen to Berg for the additional work performed.

Berg's first invoice indicates an amount due on July 1, 1981, of $69,300. This amount allegedly includes $1,800 for a land plan and $67,500 for 75% completion of working drawings. Berg's second invoice alleges an amount due on April 30, 1982, of $150,000, reflecting the $69,300 previously billed on July 1, 1981, and an additional $80,700 which Berg does not itemize but refers to generally as "professional services rendered."

Nelsen argues that at trial Mr. Berg testified that the $150,000 he was seeking included the land plan, 77% completion of the working drawings, 642 additional hours of professional services at $50 per hour and 8% of the construction management fee of $360,000. This evidence amounts to only $132,000.

Nelsen further argues that Berg's testimony illustrates that 24 hours of time allocated to Berg's "professional services rendered" to Nelsen in another lawsuit had previously been paid, thus, further reducing the total to $130,800.

Next Nelsen claims that Berg also testified that 16 hours of the additional time for "professional services rendered" between October 1979 and April 30, 1982, were allocated to cleanup of the Nelsen property following a severe storm on Hilton Head Island. The invoice was dated April 30, 1982. Nelsen argues that Berg's exhibit illustrates that estimates of this work occurred in the fall of 1982 and cleanup of the property did not occur until November 1982. Thus Nelsen requests that the 16 hours of "cleanup" allegedly included in the April 1982 invoice for $150,000 must also be excluded, bringing the total to $130,000.

Berg argues that in July 1981, it submitted a bill to Nelsen for $69,300, representing a charge of $1,800 for the site plan, and 75% completion of the $90,000 fee for the working drawings for the condominium development. In April 1982, Berg submitted a final bill for $150,000, representing $69,300 balance due from the July 1981 billing; $19,800 for additional work to complete the working drawings (97%) complete; $32,100 for 642 hours of additional work; and $28,800 for 8% of the construction management fee.

In the transcript of Albert Berg, Jr.'s testimony, the following appears:

"April 30, 1982, we submitted or tendered our second invoice at this time. We were 2 percent further complete with the working drawings. In other words, we had billed at that time 75 percent previously. We are now 77 percent complete. So we billed an additional 2 percent of the $90,000 fee."

Berg argues:

"Whether this statement was misrecorded by the reporter or misspoken by Mr. Berg, the fact is that the drawings were 97% complete in April, and the billing of $150,000 contains the additional 22 percent. The record is replete with evidence that the drawings were complete. Albert Berg III testified that he finished the working drawings in September 1981, Albert Berg testified that Ed Goode saw the drawings between the time they were started in April 1981, and September 1981 when they were finished, and the explanation of the April 1982 bill indicated that they were 97% complete."

Berg argues that the record is replete with evidence that the drawings were complete. Albert Berg III testified that he finished the working drawings in September 1981. Norman White, a licensed architect and structural engineer, testified on Berg's behalf that the working drawings would have a value of $226,000.

In addition to the billings in July 1981 and April 1982, Berg submitted an invoice to Nelsen for $1,200. Berg argues that both the invoice and the testimony indicate that the bill in July 1982 was for services performed by Berg after the April 1982 billing and in addition to the services represented by that April billing. Berg acknowledges receiving payment for those later services, and claims for that reason it sought only to recover $150,000 and not $151,200.

Berg testified that in response to complaints by local authorities and at the direction of Nelsen, he spent 16 hours supervising cleanup of the closed up Scandals facility. Berg produced evidence indicating that in November 1982, he performed additional cleanup supervision, necessitated by a storm which had passed through the area. Berg claims that it did not bill Nelsen for those hours as they occurred after the contract between Southern Pines development and Nelsen had been executed.

It is the function of the trial court to resolve conflicting testimony by addressing the credibility of witnesses and the weight to be accorded their testimony, and this finding will not be disturbed unless it is against the manifest weight of the evidence. (*In re Marriage of Durante* (1990), 201 Ill. App. 3d 376, 559 N.E.2d 56.) On appeal the court must take questions of testimonial credibility as resolved in favor of the prevailing party, and must draw from the evidence all reasonable inferences in support of the judgment. (*Chicago Title & Trust Co. v. First Arlington National Bank* (1983), 118 Ill. App. 3d 401, 410, 454 N.E.2d 723, 730, citing *Blue v. St. Clair Country Club* (1955), 7 Ill. 2d 359, 363, 131 N.E.2d 31.) This deferential attitude toward the trial court's findings of fact is based upon the realization that a fact finder which observes a witness testifying has a superior ability to assess his believability than a reviewing court, which is limited to reading a lifeless transcript. (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624; *Chicago Title & Trust Co. v. First Arlington National Bank* (1983), 118 Ill. App. 3d 401, 410, 454 N.E.2d 723, 730.) Moreover, a judgment is not against the manifest weight of the evidence merely because there is sufficient evidence to support a contrary judgment. *Tomaso v. Plum Grove Bank* (1985), 130 Ill. App. 3d 18, 24, 473 N.E.2d 588, 593.

Nelsen's argument is not that Berg failed to do the work, but rather that it was either not authorized, duplicative or that Nelsen was billed for the work by Berg prior to the work being performed. It is the function of the trier of fact, in a bench trial the trial judge, to determine the credibility of the witnesses and assess the weight to be accorded their testimony. This court cannot substitute its

judgment for that of the trial court unless it appears that the decision of the trial court was against the manifest weight of the evidence. (*Tomaso v. Plum Grove Bank* (1985), 130 Ill. App. 3d 18, 473 N.E.2d 588.) We find that judgment in the amount of $150,000 in favor of Berg was not against the manifest weight of the evidence.

## IV

In its last point Nelsen argues that it is entitled to a new trial because the record, considered in its entirety, illustrates that Nelsen was denied a fair and impartial trial on the merits. Specifically, Nelsen asserts that the trial court erred in admitting evidence irrelevant to the issues in the pleadings; that the trial court erred in precluding Nelsen from admitting evidence relevant to issues of liability and damage issues; and that the trial court's conduct, in conjunction with the improper evidentiary rulings, illustrates that Nelsen was denied a fair and impartial trial.

■■ Rulings with respect to evidence are within the sound discretion of the trial court and will be interfered with only where such discretion has been clearly abused. (*Levenson v. Lake-To-Lake Dairy Cooperative* (1979), 76 Ill. App. 3d 526, 394 N.E.2d 1359.) For the following reasons, we find that the trial court did not clearly abuse its discretion with regard to any evidentiary rulings.

■■ Nelsen argues that Berg introduced evidence regarding work which included obtaining sewer allotments, an inventory of stolen items at Scandals, cleanup, additional punchlists and professional services in another lawsuit. Nelsen claims that nowhere is such work brought into issue in the complaint nor does such evidence tend to make those facts alleged in the complaint more or less probable. We have already addressed the issue of whether a fatal variance existed between the pleading and the proof. The evidence of "additional work" was brought into issue in the contract attached as an exhibit to the complaint and in the bills attached as an exhibit to the complaint.

During its case in chief, Nelsen attempted to elicit evidence to show that at the same time Nelsen is alleged to have authorized continued development of the vacant property by requesting working drawings for a 60-unit condominium project, it had placed the property on the market for sale. Nelsen attempted to show that Albert Berg, Jr., president of Berg & Associates, together with Edwin Goode, placed an offer to purchase the property in March of 1981 which was ultimately accepted by Nelsen. The court sustained Berg's relevancy objection regarding this testimony. An offer of proof by Nelsen consisted of an exhibit that illustrated that several offers were

made to purchase the property, including the offer of Mr. Berg and Mr. Goode. An exhibit of Nelsen's also illustrates that Berg and Goode planned to further develop the property into a residential complex.

█ Nelsen claims the trial court also precluded Nelsen from presenting evidence contrary to Berg's allegations regarding the value of such working drawings. Berg assessed Nelsen a cost of $67,300 for the preparation of these working drawings. The judgment entered against Nelsen in the amount of $150,000 allegedly includes a $69,300 charge for these drawings (Berg's invoices indicate that it is charging Nelsen for 77% completion of the working drawings it valued at $90,000). Nelsen attempted to discredit Berg's allegation with evidence tending to disprove that the working drawings were prepared for Nelsen or that their alleged value was proper. Nelsen attempted to introduce into evidence drawings prepared for a Wisconsin development called Willabay Shores to illustrate that the Willabay Shores drawings were virtually identical to the drawings allegedly prepared by Berg for Nelsen. The trial court did not admit the Willabay Shores drawings into evidence. However, the record discloses that defense counsel had the opportunity to extensively question Richard Berg about the similarities between the Willabay Shores drawings and the drawings allegedly prepared by Berg for Nelsen. The trial court allowed defense counsel to "go ahead" when defense counsel stated, "I would attempt to show these drawings [the drawings prepared by Berg] are tracings of the Williams Bay, Wisconsin [sic] [Willabay Shores] drawings, an absolute identical tracing, these drawings that he's [Berg] seeking to claim $90,000 for." Defense counsel superimposed Berg's drawings over the Willabay Shores drawings. In fact, the trial judge stated, "The Court can see that the drawings are almost identical." Although the court ultimately excluded the Willabay Shores drawings themselves, the record discloses that Nelsen was given the opportunity when questioning Richard Berg, Albert Berg III, and Norman White to elicit testimony comparing details of the drawings prepared for Nelsen with the Willabay Shores drawings. We do not feel the trial judge's ruling excluding the drawings themselves prejudiced Nelsen's case to the extent that reversal is appropriate. Any prejudice caused by the exclusion of the drawings was harmless error.

█ The trial court also denied evidence regarding Berg's tendering of a check to Nelsen in the amount of $100,000. Through an offer of proof, Nelsen presented a $100,000 check dated March 11, 1982, made out to Nelsen and signed by Albert Berg and Ed Goode. Berg's

testimony established that it considered Nelsen in breach of their agreement in August 1981, for its failure to pay $69,300 allegedly due under the July 1, 1981, invoice. Nelsen questioned Albert Berg, Sr., as to why, if Nelsen truly owed Berg $69,300 under the July 1, 1981, invoice, it would issue a $100,000 check rather than effect a setoff, in whole or part, or at a minimum raise the issue of the alleged outstanding balance with Nelsen. Nelsen asserts that as Nelsen attempted to elicit Albert Berg, Sr.'s testimony, the trial court limited Nelsen's offer of proof, and as a result, Nelsen was not able to fully explore the alleged inconsistency. The record discloses the following colloquy:

"MR. TIPPINS [Nelsen's counsel]: Exhibit 40 is a check for $100,000 dated March 11th, 1982, and it is signed by Mr. Berg and Mr. Goode, and there was a notation on it, 'Agreement between the parties herein for real estate property located on Hilton Head Island, South Carolina.'

And the offer of proof would be that if Mr. Berg had actually submitted an invoice for $69,300 in 1981 that hadn't been paid, I would like to find out why he was issuing them a check for $100,000 in 1982 rather than just having a set off.

THE COURT: Okay. What's the answer?

THE WITNESS [Albert Berg, Sr.]: The firm of Southern Pines went into a purchase agreement with the—to purchase the property, and with the principals being Ed Goode and myself.

BY MR. TIPPINS:

Q. Well, that's correct quite. The principals were Ed Goode, yourself, and Berg and Associates, Inc.; isn't that right?

A. Berg and Associates, Inc., would be the construction managers on it.

Q. They would be the principal signatory of the contract.

A. Well, that's not who purchased it."

The court stated that Nelsen got its offer of proof and did not allow further questions. We agree with the trial court's ruling.

Nelsen further contends that it was denied a fair trial because the trial court repeatedly expressed impatience toward defense counsel and erroneously denied defense counsel the opportunity to present his case effectively. One of the cases Nelsen cites in support of its request for a new trial is *People v. Eckert* (1990), 194 Ill. App. 3d 667, 552 N.E.2d 820. We feel there are significant differences between *Eckert* and the present case. The *Eckert* case was a criminal matter tried before a jury. The judge repeatedly made comments like "I can't hear

you" and "I'm turning my hearing aid off." The judge initially denied defense counsel's request to make an offer of proof, and when it was finally allowed, it was made out of the hearing of both the judge and the jury.

For comments by a trial judge to constitute reversible error, the defendant must show that the remarks were prejudicial and that he was harmed by the comments. (*People v. Pecka* (1989), 183 Ill. App. 3d 60, 71, 538 N.E.2d 1189, 1196.) "In the absence of a showing of animosity, hostility, ill-will or distrust towards the defendant, proof falls short of establishing the actual prejudice which would interfere with a fair trial." (*People v. Neumann* (1986), 148 Ill. App. 3d 362, 370, 499 N.E.2d 487, 492, citing *People v. Vance* (1979), 76 Ill. 2d 171, 390 N.E.2d 867.) Moreover, during a nonjury trial, the comments of a trial judge are allowed greater latitude than would be acceptable were a jury present. (*Joray Mason Contractors, Inc. v. Four J's Construction Corp.* (1978), 61 Ill. App. 3d 410, 378 N.E.2d 328.) In the case before us, Nelsen has failed to prove actual prejudice. Taken in context, most of the court's statements appear to be attempts by the court to move the trial along, indicating no prejudice toward Nelsen. Further, after closing arguments the trial court stated:

"I said before there's been a lot of work done by both of you, and I appreciate that. You've represented your clients—I want your clients to know that you both did a very good job, as far as I'm concerned. More importantly, I think you're both gentlemen, and you cooperated with me to the fullest extent. I know that. So, I do want to say that if you have another case to try, come back here any time."

After a review of the record, we cannot say the trial court displayed such bias or improper conduct as would deprive defendant of a fair and impartial trial. Further, if any error did exist it amounted to harmless error. *People v. Merz* (1984), 122 Ill. App. 3d 972, 461 N.E.2d 1380.

Accordingly, for the reasons set forth above, we affirm the decision of the trial court.

Judgment affirmed.

LORENZ, P.J., and McNULTY, J., concur.