**BRANT CONSTRUCTION COMPANY, INCORPORATED, an Indiana domestic corporation, and Dyer Construction Company, Incorporated, doing business as Brant Construction Company, Incorporated and Dyer Construction Company, Incorporated, A Joint Venture, Plaintiffs–Appellants,**

v.

**METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, an Illinois municipal corporation, Defendant–Appellee.**

No. 91–1945.

United States Court of Appeals, Seventh Circuit.

Argued January 8, 1992.

Decided July 17, 1992.

Gary L. Griffin, McNeela & Griffin, Chicago, Ill., Stephen M. Maish (argued), Patrick A. Mysliwy, Susan F. Castner, Maish & Mysliwy, Hammond, Ind., for plaintiffs-appellants.

Robert L. Abraham (argued), James B. Murray, Ronald M. Hill, Metropolitan Sanitary Dist. of Greater Chicago, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, POSNER and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

The Metropolitan Sanitary District of Greater Chicago, now known as the Metropolitan Water Reclamation District of Greater Chicago ("Reclamation District"), solicited bids for the construction of its proposed St. Michael Reservoir to be constructed in Palatine, Illinois. The project required the contractor to furnish all materials, labor and equipment necessary for the construction of a 6,000 foot-long earth dam embankment with compaction and to conduct extensive foundation removal beneath it. In conjunction with the bid solicitation, bidders were given notice of the bidding requirements and general specifications. The Reclamation District provided

the bidders with plans and specifications for the project, as well as the soil borings and soil analyses on which those plans were based. It also provided bidders with the opportunity to conduct further tests of their own.

The construction contract was awarded to the low bidder, a joint venture of Brant Construction Company, Inc. and Dyer Construction Company, Inc. ("Brant–Dyer"). Although the total value of the contract was not certain, Brant–Dyer signed a Contractor's Bond for seven million, five hundred ninety-six thousand, four hundred sixty-four dollars and seventy-eight cents (Exhibit D at B–1). On item 9 of the Bid Proposal, one of forty-three bid items, Brant–Dyer bid $1.90 per cubic yard for "Common Excavation—Foundation and Permanent Pool." This bid for "common excavation" was obtained by estimating the amount and cost of two types of excavation that would be required to complete the job—scraper excavation and dragline excavation. Dragline excavation is at least twice as costly as scraper excavation (Joint App. 43).

The Reclamation District originally anticipated common excavation of approximately 518,718 cubic yards of material, but later revised that estimate to 596,192 cubic yards prior to any bidding (Joint App. 60, 75). Of that amount, the Reclamation District estimated that only 18,006 cubic yards of dragline excavation would be required. (Joint App. 46). However, after Brant–Dyer conducted excavation to the specified level set forth in the plans (the "neat lines"), the Reclamation District's chief engineer found the soil at that level unsuitable and ordered further excavation beyond the neat lines, viz., "overexcavation." Ultimately the contractor was required to overexcavate 67,-804 cubic yards of soil, roughly 7% more than the approximate quantity set forth in the contract. Most of that overexcavation involved unsuitable "laucustrine" soils which had to be removed by the more costly dragline method of excavation.

The parties do not dispute the Reclamation District's responsibility to compensate Brant–Dyer for the overexcavated materi-al. Rather, they dispute the appropriate measure of that compensation. The Reclamation District asserts that it has satisfied its financial obligation to Brant–Dyer because it has paid the basic contract price, $1.90 per cubic yard of material excavated, for the quantity of material actually excavated, including overexcavation. However, Brant–Dyer seeks an additional $187,270.02 for the actual cost of the overexcavation, which cost it estimates to be $4 per cubic yard of soil removed, more than twice the unit price provided by the contract.

The district court assumed jurisdiction over this case based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a). District Judge Zagel rejected Brant–Dyer's claims for additional payment under Illinois law and granted the Reclamation District's motion for summary judgment. On appeal, Brant–Dyer contests that judgment and seeks $187,270.02 for its overexcavation claim. For the reasons set forth below, we affirm the judgment of the district court.

I.

A. *Extra Work*

Under Illinois law, in order for a contractor to recover money for "extra work," it must show by clear and convincing evidence that the work was 1) outside the scope of the original contract; 2) ordered at the direction of the owner; 3) agreed to be paid for by the owner either by words or by conduct; 4) not voluntarily furnished by the contractor; and 5) not rendered necessary by fault of the contractor. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198 (7th Cir.1985); *Berg & Assoc., Inc. v. Nelsen Steel & Wire Co.*, 221 Ill.App.3d 526, 162 Ill.Dec. 779, 580 N.E.2d 1198 (1st Dist. 1991); *Duncan v. Cannon*, 204 Ill.App.3d 160, 149 Ill.Dec. 451, 452–453, 561 N.E.2d 1147, 1148–1149 (1990); *Mayer Paving & Asphalt Co. v. Morse, Inc.*, 48 Ill.App.3d 73, 8 Ill.Dec. 122, 365 N.E.2d 360 (1st Dist. 1977); *Strom v. Lipschultz*, 5 Ill.App.3d 308, 282 N.E.2d 257 (2d Dist.1972); *Watson Lumber v. Guennewig*, 79 Ill.App.2d 377, 226 N.E.2d 270 (5th Dist.1967). In this case, both parties agree that four of the

five factors have been met. However, the parties disagree with respect to the first factor—whether the work done by the contractor was outside the scope of the original contract.

Brant-Dyer asserts that the excavation it performed outside of the Reclamation District's specified lines and grades, the "neat lines," fell outside the scope of the contract. Some contractual language appears to support Brant–Dyer's assertion. For example, the construction specification regarding excavation defines "scope" as follows: "[t]he work shall consist of the excavation required by the drawings and specifications and disposal of the excavated materials" (Joint App. 76). Moreover, the section of the contract regarding payment provides that when unit prices are specified, the price shall include all equipment and labor "necessary to complete the work as specified in the Detail Specifications" (Joint App. 68).

However, the contract does not end there. Instead, the contract explicitly contemplates and resolves the issue of payment for overexcavation when the soil is unsuitable, the matter at issue here. The contract provides that "Regardless of the quantities excavated, the measurement for payment will be made to the specified pay limits, except that excavation outside the specified lines and grades directed by the Engineer to remove unsuitable material will be included, but only to the extent that the unsuitable condition is not a result of the Contractor's operations" (Joint App. 79). Thus any overexcavation "directed by the Engineer to remove unsuitable material" was contemplated within the scope of the contract.

Brant–Dyer asserts that the question of whether the material removed was actually unsuitable, and therefore within the scope of the contract, is a factual question for a jury, rather than a question to be determined at the sole discretion of the Reclamation District's chief engineer. Brant–Dyer contends that unless the question of soil suitability is subject to a jury determination based on reasonableness, the engineer

could force the contractor to "dig to China" within the parameters of the contract.

However, a promise conditioned on the satisfaction of a party, analogous to the contractual provision at issue here, is not limitless. Under Illinois contract law, the limits depend on whether the contract requires subjective or objective satisfaction. *Bishop v. Bloomington Canning Co.*, 307 Ill. 179, 138 N.E. 597, 598 (1923); *Union League Club v. Blymyer Ice Mach. Co.*, 204 Ill. 117, 68 N.E. 409, 413 (1903); *In re Estate of Bajonski*, 129 Ill.App.3d 361, 84 Ill.Dec. 672, 472 N.E.2d 809 (1st Dist. 1984); *Ray v. Georgetown Life Ins. Co.*, 94 Ill.App.3d 863, 50 Ill.Dec. 613, 614, 419 N.E.2d 721, 722 (3rd Dist.1981). In contracts involving matters of fancy, taste, sensibility and judgment, the nature of the promisor's satisfaction is subjective. *Beasley v. St. Mary's Hosp.*, 200 Ill.App.3d 1024, 146 Ill.Dec. 714, 719, 558 N.E.2d 677, 682 (5th Dist.1990). In those cases, a party is the sole judge of its own satisfaction, "without regard to the justice or reasonableness of [its] decision, and a court or jury cannot say that such party should have been satisfied when [it] asserts that [it] is not." *Id.* The only limit on contracts which provide for subjective satisfaction is bad faith. *Id.* On the other hand, in contracts involving "operative fitness" or "mechanical utility," the nature of the promisor's satisfaction is objective and must be reasonable. *Id.*

But even where the matter is capable of objective evaluation, a contracting party can premise the contract on its subjective satisfaction if it makes this an explicit condition of the contract. *Forman v. Benson*, 112 Ill.App.3d 1070, 68 Ill.Dec. 629, 446 N.E.2d 535 (2d Dist.1983). Here the contract directly states that

"[t]o prevent all disputes and litigation, it is further agreed by and between the Sanitary District and the contractor that the engineer shall in all cases decide every question of an engineering character which may arise relevant to the execution of the work under this contract on the part of the contractor, and his decision shall be final and conclusive on both

parties hereto; and such decision, in case any question may arise, shall be a condition precedent to the right of the contractor to receive any money or compensation for anything done or furnished under this contract" (Joint App. 67).

A jury is not the appropriate arbiter of soil suitability where the contract explicitly delegates that task to the Reclamation District's chief engineer. Because the engineer determined that the soil at the neat lines was unsuitable, and Brant–Dyer has not alleged that the engineer acted in bad faith, the overexcavation fell within the scope of the contract.

The extra work doctrine affords compensation for work that was not within the scope of the contract, such that the parties could not have established a contract price of their own. But where, as here, the contract affixed the appropriate measure of payment, the contractually agreed upon rate of compensation will prevail. A contractor has no right to additional compensation even though the contractual price was too low and caused it to lose money on the project. *Booher v. Williams*, 341 Ill.App. 504, 510, 95 N.E.2d 518, 521 (1950). Thus the contract price of $1.90 per cubic yard was the appropriate rate of payment for the disputed work, and Brant–Dyer was not entitled to actual costs plus a percentage markup, the measure of payment accorded by the contract for extra work (Joint App. 71–73).

## B. Defective Plans

Brant–Dyer also claims that the Reclamation District breached an implied warranty that the plans it furnished would be adequate to determine the quantity of material to be removed in the claim area. Ordinarily, where an owner provides a contractor with plans and specifications, the owner is deemed to warrant the adequacy of the plans and specifications in rendering satisfactory completion of the work. *Fattore Co. v. Metro. Sewerage Com.*, 505 F.2d 1, 4 (7th Cir.1974).

However, the Reclamation District specifically stated that the plans were approximations and disclaimed that the quantity of material to be removed would be the ultimate quantity. The contract specified that "Bidders must determine for themselves the quantities of work that will be required and the conditions under which the work will be performed * * * and shall assume all risks as to any variations in the approximate quantities noted" (Joint App. 61). It further stated that

"Bidders shall not at any time after the submission of a proposal, dispute or complain of the aforesaid list of approximate quantities or assert that there was any misunderstanding as to the amount or character of the work required to be done, and shall not make any claims for loss of profits or for an extension of time because of a difference between the approximate quantities of the various unit price bid items, and the actual quantities of work performed." *Id.*

Thus as the district court noted, actual reliance by the contractor in submitting its bid would be immaterial because such reliance would appear to have been unreasonable. See *W.H. Lyman Constr. Co. v. Gurnee*, 84 Ill.App.3d 28, 38 Ill.Dec. 721, 403 N.E.2d 1325 (2d Dist.1980) (holding that where the contractor had a duty to make an independent inspection of the worksite, the village and the engineering firm were not liable on a defective plans theory when the subsurface conditions were contrary to indications in the plans and specifications).

Yet some courts have held that reliance on the plans and specifications is reasonable, or at least reasonably foreseeable to the promisor, despite explicit disclaimers. See, *e.g., Alpert v. Commonwealth*, 357 Mass. 306, 258 N.E.2d 755 (1970). In that case the Massachusetts Supreme Judicial Court held that where a construction contract provided one unit price for excavation of both suitable and unsuitable material, the contract would be read to provide two different prices for those types of material, because the quantity of unsuitable material was much greater than anticipated and because the contractor had relied on the plans and information furnished by the department of public

works in submitting its bid. However, this case is unlike *Alpert*. In *Alpert* the department of public works told the contractor that it had been given "complete information" even though the department had not disclosed all of the information in its possession. The contractor was not informed of boring samples or soils analyses. Neither was the contractor informed that the borings were only taken in a limited area of the project and provided an inadequate basis for the department's estimates of the amount of unsuitable material at the site. *Id.* at 763. In this case, on the other hand, Brant–Dyer had access to the Reclamation District's borings, samples and analyses, and Brant–Dyer does not contend that this information was false, incomplete, misleading or fraudulent. Furthermore, the Reclamation District gave Brant–Dyer and other bidders the opportunity to conduct their own additional tests prior to bidding.

The Reclamation District's analysis took over two years to complete, and it well may be that Brant–Dyer did not have sufficient time to conduct its own soils analysis from scratch in the sixty days provided for testing. But given Brant–Dyer's opportunity to examine the Reclamation District's analyses and its ability to supplement that information with its own tests, this was not a case like *Alpert* in which one party was unwittingly bargaining in the dark, while the other party was bargaining in the light. Instead, Brant–Dyer had full access to the information from which the Reclamation District devised its plans. After independently appraising the basis and soundness of those plans, Brant–Dyer chose to assume the risk that the quantities set forth could vary from the approximate quantities. The fact that the plans led to an unsatisfactory result does not raise a presumption that the plans were defective. *McKay Engineering & Constr. Co. v. Sanitary Dist. of Chicago*, 348 Ill.App. 89, 108 N.E.2d 39 (1st Dist.1952).

### C. Changed Condition

Finally, Brant–Dyer asserts that a changed condition theory "affords a recovery where there is a material variance between the work contemplated by the parties at the time of contracting and the work actually performed" (Br. 13). But this claim is meritless. The contract specifically provides for "Changes in Plans and Specifications" (Joint App. 70). It states that "If [alterations in the plans or specifications] increased the quantity of work to be done, where unit prices are specified, such increase shall be paid for according to the quantity of work actually done at the unit price specified in the contract for each class of work performed." *Id.* Unit prices were provided for common excavation, the type of overexcavation at issue. As the district court aptly noted, "the contract contemplated this very event and laid the risk in the plaintiff's lap. The fact that the risk worked against the plaintiff is no basis for recovery."

For the foregoing reasons, the judgment of the district court is affirmed.