2026 IL App (1st) 240901-U

Fourth Division
Filed March 31, 2026

No. 1-24-0901

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| D. CONSTRUCTION, INC., | ) |
|     Plaintiff-Appellant and Cross-Appellee, | ) Appeal from the ) Circuit Court of Cook County |
| | ) |
| v. | ) No. 2019 L 009852 |
| | ) |
| COMMONWEALTH EDISON COMPANY, | ) The Honorable Daniel J. Kubasiak, |
|     Defendant-Appellee and Cross-Appellant. | ) Judge, presiding. |
| | ) |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Navarro and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm the circuit court's order granting dismissal of the defendant's claim for early completion incentives, its order granting partial summary judgment, and its order granting the defendant's motion for directed finding. We also affirm the circuit court's post-trial order; however, we reverse the grant of prejudgment interest.

¶ 2     The plaintiff, D. Construction, Inc., sued the defendant, Commonwealth Edison Company ("ComEd"), following the termination of contracts between the parties. Prior to trial, the circuit court dismissed one of D. Construction's claims, and following a bench trial, the court found that D. Construction was entitled to partial recovery on Count I of its complaint and no recovery on Counts II and III. The court also found in favor of ComEd on its counterclaims. D. Construction

appeals. ComEd cross-appeals, arguing the court erred in determining prejudgment interest. For the reasons outlined below, we affirm in part and reverse in part.

¶ 3                                    I. BACKGROUND

¶ 4        D. Construction provided construction services to Exelon Generation Company, LLC ("Exelon Generation"). In 2014, D. Construction submitted bids, which included ComEd Perfect Commerce Event 6130 ("Event 6130") and request for proposal 029 ("Event 029"), and began providing construction services for ComEd. Exelon Generation and ComEd were subsidiaries of Exelon Corporation ("Exelon"). D. Construction performed general civil work and facilities enhance program work ("FEP Work") for ComEd. Civil work entailed foundation work, substation work, yard stone, and drill shafts. The FEP Work included security upgrades such as fencing, technology, and lighting.

¶ 5        Civil work performed by D. Construction was governed by two successive sets of master terms and conditions and blanket master contracts. Civil work performed before December 31, 2017 was governed by the Master Terms and Conditions Contract signed on April 24, 2014 ("2014 Master Terms") and the blanket master contract signed December 10, 2014. Civil work performed on or after January 1, 2018 was governed by a new Master Terms and Conditions Contract signed on August 11, 2017 ("2017 Master Terms," collectively together with the 2014 Master Terms "Master Terms") and a blanket master contract signed on January 26, 2018. FEP Work performed by D. Construction was governed by individual contracts for each project. The aforementioned contracts will be referred to herein collectively as the "Agreements."

¶ 6        The Agreements between the parties included "volume discounts," which were discounts ComEd received based on a percentage of ComEd's annual spending on work performed by D. Construction. Civil work and FEP work were subject to different volume discounts tiers. There were no volume discounts for work done for Exelon Generation. ComEd could also receive prompt payment discounts by paying D. Construction's invoices within 10 days after receipt.

¶ 7        In April 2018, ComEd terminated its Agreements with D. Construction for convenience, pursuant to the Agreements' terms. At the time, there were numerous uncompleted projects.

¶ 8        Revenew International, LLC ("Revenew") performed audits of the parties' invoices. In 2012, Revenew audited D. Construction's work for Exelon Generation from 2010-2012. In 2016, Revenew audited D. Construction's work for Exelon Generation and ComEd from 2014-2015. In 2018, Revenew audited D. Construction's work for ComEd from 2015-2018.

¶ 9        In its second amended complaint, D. Construction raised four breach of contract claims. Count I alleged that ComEd underestimated the earned value,—the amount it owed D. Construction for work completed at the time of termination—for seven projects. Count II alleged that D. Construction was entitled to a refund for volume discounts given to ComEd. Count III alleged that D. Construction was entitled to prompt payment discounts. Count IV alleged that D. Construction was entitled to early completion incentives. ComEd filed a counterclaim seeking to recover amounts it overpaid on two projects and volume discounts owed by D. Construction for 2017 and 2018.

¶ 10       ComEd filed a motion to dismiss D. Construction's second amended complaint. In April 2021, the circuit court dismissed count IV of D. Construction's second amended complaint. The court found that the Master Terms and FEP purchase orders' plain language did not include early completion incentives.

¶ 11       Prior to trial, ComEd filed a motion for partial summary judgment. In relevant part, ComEd argued that the terms of the Agreements set forth the earned value calculation for the projects at issue. On December 1, 2023, the circuit court granted ComEd's motion for summary judgment as to the contractual obligations to calculate damages under Count I. The court found that sections 18.4.2 and 18.5 of the Master Terms were clear and unambiguous and controlled the calculation of damages.

¶ 12       A four-day long bench trial was held for D. Construction's remaining claims and ComEd's counterclaims. Matt LaPoint, a project manager and structural designer for D. Construction, testified he was a project manager for the projects in dispute and he was involved in the bidding

for those projects. During the bidding process, D. Construction completed unit pricing sheets, which had line items for each task to be completed during a project. The aggregate sum of these line items became the lump sum total for a project. LaPoint testified that D. Construction's bids were part of the Agreements between the parties as the Agreements would reference the bid documents and the bid documents were attached as an exhibit to the contracts. LaPoint testified that the civil work was governed by the blanket contracts and the Master Terms. The FEP work was performed under different contracts.

¶ 13       After termination of the Agreements, D. Construction determined the earned value by going through each line item on the unit pricing sheet. LaPoint testified that if it was finite calculation, D. Construction would apply that to the quantities performed in order to get a completion percentage for each line item. If the calculation "was a little less clear," D. Construction, along with its subcontractors and onsite managers, would perform final onsite walkdowns for work performed. LaPoint prepared the earned value calculations for the project. In order to determine the earned value, he went down each line item, identified what and how much was done, and what the agreed price was. LaPoint's earned value calculations for each project was admitted into evidence.

¶ 14       At the time the Agreements were terminated, the Itasca Fencing Project was partially completed. This project was a part of the FEP work and was a lump sum contract. LaPoint's earned value calculation for this project was $1,992,473.62. LaPoint testified that 42.72% of line 15, vacuum excavate fence post and gate post holes, had been completed. He arrived at this number as 42% of the fence had been completed.

¶ 15       The Des Plaines Flood Wall Project was also partially completed at the time the Agreements were terminated. LaPoint testified that ComEd paid a portion of the earned value calculation for this project but "276,000 and some change" was still outstanding. Line item 12, for ground penetration radar, was calculated to be 50% complete. LaPoint testified that mobilizing the radar was one of first things done at the site and it was done prior to starting construction. LaPoint also testified that for line item 62, D. Construction determined how long it had a dedicated project

manager for the project. The bid amount was for 250 days, and D. Construction's calculation of 198 days included not only on-site days but also days in the "office setting, going to permit meetings, [and] helping ComEd get through the permitting process."

¶ 16 LaPoint was involved in the Wilton Center project. LaPoint was involved in the preparation of the earned value calculation for this project. Line item 43 involved the rip rap, which is a stone. D. Construction listed this line item as 1418% complete. LaPoint testified that D. Construction was directed by ComEd to furnish more rip rap than originally planned. ComEd's on-site construction manager directed that the work be done and he assured D. Construction it would get paid for the work. LaPoint testified that D. Construction would not have done the additional work but for ComEd's assurance it would be paid. LaPoint testified that a change order was not submitted for this work because the job was close to being done and it was not unusual for extra work to be performed without a signed change order.

¶ 17 D. Construction listed line item 71, yard stone, as 123% complete. LaPoint testified that D. Construction was asked to do extra work by the same on-site manager and it did the work with the understanding it would be paid. LaPoint testified that a change order was not submitted for this work for the same reason as the work for rip rap.

¶ 18 The Calumet Fencing project was in progress when the contract was terminated. ComEd disputed $287,000 of the amount calculated by D. Construction. LaPoint testified that ComEd "never really provided a clean explanation on some of their disputes." Line item 102, furnish and install concrete driveway, was listed as 100% complete by D. Construction. LaPoint testified that D. Construction installed the entire driveway in accordance to the plans.

¶ 19 The Bellwood Red Bus project was complete when the contracts were terminated. Following termination, ComEd denied two change orders for this project. LaPoint testified that there were two ways to get a change order. One way would be if ComEd revised the construction plans. D. Construction would look at the new plans, and it would notify ComEd if the change would cost more or if it reduced the scope of work. Once ComEd agreed to the work, D. Construction would do the work and bill ComEd. There were also formal change orders, which required ComEd to

sign off on the new scope of work prior to D. Construction moving forward. LaPoint testified that the change orders at issue were for $49,000 worth of work. A second drill shaft had to be built because a third party employee poured concrete into the initial drill shaft. LaPoint testified that D. Construction was asked to make the second drill shaft by ComEd's project management department. D. Construction was not told they would be paid for this work, and it did not insist that a change order be completed prior to the work being done. LaPoint testified that for this project "we negotiated maybe three to five change orders that weren't previously agreed to after we were terminated, so it wasn't uncommon for us to negotiate these things *** after the fact." LaPoint further testified that the disputed change order for the drill shaft was not approved by ComEd because it faulted D. Construction for the issue with the initial drill shaft as it had command of the site. Regarding the denied change order for manholes, LaPoint testified that "[t]he design drawings had changed from what I remember."

¶ 20    LaPoint was involved with the Northwest Lighting project. At the time the contracts were terminated, work had not begun on the project, D. Construction provided ComEd with the materials it purchased for the project. LaPoint testified that D. Construction gave ComEd all of the material and charged them $537,125.47. LaPoint does not recall ComEd objecting to the materials. LaPoint testified that ComEd was not overcharged for the materials.

¶ 21    The Calumet Lighting project was not started when the contracts were terminated. D. Construction purchased and delivered the materials for the project. LaPoint testified that ComEd did not recall ComEd disputing receiving the materials.

¶ 22    LaPoint further testified that he was involved in the billing processes between ComEd and D. Construction. There were times when the parties adjusted payments after they were paid. LaPoint testified that, for example, in 2017 the parties would sit down and go over projects. They would look at the scope completed, the quantities completed, and change orders added to the contract. Invoices would be adjusted based on these meetings and negotiations. LaPoint testified that these meetings occurred in addition to the audit process.

¶ 23    On cross-examination, LaPoint testified that he tried to visit each site at least once a week. At the time of termination, LaPoint walked down the sites of the Des Plaines, Wilton Center, Bellwood Red Bus, and Calumet Fencing projects. He did not take pictures during these walk downs. When the contracts were terminated, the goal of the walk downs was to introduce the new contractors to the job sites. With respect to the Northwest Lighting project, D. Construction would place an order with one of its subcontractors for materials and then the subcontractor would be responsible for getting the materials to the site. D. Construction received an invoice for materials, with an order date of June 12, 2018, after the contracts were terminated. ComEd requested information regarding material acquired for the Calumet Lighting project; however, D. Construction did not provide that information to ComEd. LaPoint testified that ComEd had "never asked for them before. It wasn't how we did business."

¶ 24    Following the termination of the contracts, D. Construction sought approval of eight change orders, two relating to the Bellwood Bus project. ComEd denied the Bellwood Bus project change orders. LaPoint testified that he was not at the project site when the concrete was pushed down the shaft. He also testified that D. Construction was responsible for the concrete; however, the concrete was pushed down by a third-party individual. LaPoint testified that ComEd was entitled to deny change orders "if they don't agree."

¶ 25    Concerning the Des Plaines Floodwall project, on cross-examination LaPoint testified that D. Construction was building a raised wall around the electrical facility to protect it from water. The wall was 26% complete at the time of termination. During the project, there were spoil pits, which were areas where soil, rock fragments, and other debris are placed during construction. LaPoint agreed that, with only 26% of the floodwall being completed, more spoil pit usage would have been needed in order to complete the project. D. Construction did not continue to maintain the spoil pits after the termination. The same would apply to loading out the spoil pits; more would have been taken out of the site as the project progressed. For all of the disputed line items, D. Construction had a higher competition percentage and ComEd had them at 26%.

¶ 26    Concerning credits, LaPoint agreed that once invoices were paid, they were not changed. Rather, credits are applied to future invoices.

¶ 27    On redirect examination, LaPoint confirmed he was not involved with the 2015 and 2016 volume discounts. Regarding the Bellwood Red Bus project, LaPoint testified that ComEd did not dispute D. Construction's facts as to how the concrete was put into the drill shaft.

¶ 28    Robert Male, an employee of D. Construction, testified that he was involved with invoicing for ComEd projects from 2014 to 2018. His work included putting together invoices for projects and requesting payment authorization from ComEd. Male received the information for these invoices from the project management team, which included Matt LaPoint, Mike Harr, Jodie Residori, and Andrew Moore. After Male created an invoice, he sent it to the ComEd project management team in order to get payment authorization. Male tracked invoices and payments on a spreadsheet. Male also tracked if prompt payment discounts were applied. Male did not calculate the prompt payment discount. Rather, he imported the number from the Exelon accounts payable site. Male did not determine if these discounts were proper. He would pass the information on to the project management team for them to discuss with ComEd. Male was also involved with the 2016 audit. For the audit, Male gathered data pertaining to invoicing. Male testified that gather information based on what was requested from Revenew.

¶ 29    On cross-examination, Male testified that others could ask to look at the spreadsheet and have access to the information. Male was only responsible for billing ComEd's civil projects. The information regarding FEP work came from Jenny Martino. Male also confirmed that D. Construction had a summary sheet of both civil and FEP work and this information was given to project managers. Regarding the audit, Male testified as a result of the audit invoices were not changed.

¶ 30    Jodie Residori, an employee of D. Construction, worked in the project control department and she was familiar with D. Construction's work for ComEd. Residori began working at D. Construction after the Agreements were terminated. Residori testified it was her understanding that the Agreements between D. Construction and ComEd included volume discounts. Civil and

FEP contracts were not subject to the same volume discount tiers. Residori testified that the discount rate for civil projects was determined by the blanket contracts, and the FEP work discount rate was based on the 6130 event. The FEP volume discount was lower than the civil volume discount. The work D. Construction did for Exelon between 2012 and 2018 did not include a volume discount. The blanket agreements between D. Construction and ComEd included a tiered volume discount system for civil work from 2014 to 2017 and different volume discount rate for work from 2018 to 2020.

¶ 31    In October 2018, Residori became involved in volume discounts. Residori testified that she received an email from her boss, Mike Harr, asking her to verify the 2017 and 2018 volume discounts. ComEd sent D. Construction the estimated total spend amounts for 2017 and 2018 and the requested volume discounts. Residori testified that after her review, she concluded there were errors in ComEd's calculation. Residori testified that the spend amounts for civil work and FEP work were incorrect as some of the line items were in the wrong category. Some line items were characterized as civil work when it should have been FEP work. If the line items had been characterized as FEP work, the volume discount would have been lower. Residori also testified that Exelon spend was included in the spend report, and this work was not subject to volume discounts. Residori looked at each of the contracts on the spend reports to verify the characterization of each line item.

¶ 32    Residori also looked at the 2015 and 2016 volume discounts. Residori did not work for D. Construction during this time period. To verify the discounts, she looked at the blanket contract and each individual project contract. Residori testified that there were no spend reports for the 2015 and 2016 volume discounts. Residori requested a copy of the 2015 and 2016 spend reports from ComEd. Residori reviewed the reports and she concluded that the 2015 and 2016 volume discounts were inaccurate. The inaccuracy was due to projects being miscategorized. Residori created her own spreadsheets, and she recategorized ComEd's spend reports. Residori estimated D. Construction overpaid $996,808.14 in 2015 and $1,782,259.49 in 2016.

¶ 33    Residori testified that she was familiar with prompt payments discounts. Residori testified that the contracts between the parties included this discount based on Event 6130. Residori reviewed the spreadsheet created by Robert Male and removed lines that did not apply to the prompt payment discount. Residori testified that she calculated that ComEd improperly took $137,476.86 in prompt payment discounts.

¶ 34    On cross-examination, Residori testified that D. Construction had not paid any volume discounts for 2017 and 2018. D. Construction owed approximately $32,000 for 2017 and approximately $50,000 for 2018. Regarding prompt payment discounts, Residori received the data for when D. Construction received payment from Male's spreadsheet.

¶ 35    On redirect, Residori testified that for the 2015 and 2016 volume discounts she did not know what tiers ComEd was using to calculate discounts. Residori learned that ComEd was not using the invoiced amounts; rather, it used the amount it paid after taking the prompt payment discount.

¶ 36    Andrew Moore, the head estimator and project manager at D. Construction, was involved in D. Construction's projects with ComEd. He was a part of the billing process between the parties. He would meet with ComEd's project manager to talk about invoice amounts, and he would take those amounts back to the accounting department for billing. When an invoice was sent, ComEd paid. Moore testified that the finality of payments "were extremely flexible, they could be changed or modified." Moore further testified that "you could make things up with an invoice down the road like next month's invoice you could correct, correct any of them." These adjustments were made every month. Moore did not believe that payment of an invoice foreclosed the ability to revisit that payment in the future.

¶ 37    Moore was involved in the audits performed by Revenew International in 2012, 2016, and 2018. Moore testified that the 2012 audit informed him that "[a]ny moneys trading place could be revisited and captured, any errors either way due Exelon or D. Construction could be corrected in the audit." These audits occurred because of the volume of business between the parties, the fact that ComEd "paid promptly, which [might] not allow for *** inspection with a fine tooth comb," and his assumption that the audits would "catch any errors either way." Any errors in ComEd's

favor would be offset by errors in favor of D. Construction. For the 2016 audit, Moore was responsible for getting the requested information to Revenew. After receiving the initial information, Revenew emailed asking for additional information for specific projects, and Moore sent this additional information as requested.

¶ 38     Regarding volume discounts, Moore was involved in determining the 2015 volume discounts. ComEd requested that D. Construction fill out the tiered discount form through its Perfect Commerce system. Moore testified that the request asked for a number and did not allow the work to be distinguished between civil and FEP. Moore testified that there were different contracts between the parties and each had its own set of rules. He had conversations with individuals at ComEd seeking clarification on which set of rules applied. Moore testified that he did not get a response about this issue. In April 2016, Revenew asked how D. Construction calculated the 2015 volume discounts. Moore did not know how ComEd calculated the volume discount. He called George Triantafilpolis, ComEd's nuclear category manager, to determine how ComEd calculated the volume discounts. Triantafilpolis did not clarify Moore's questions. Moore did not provide Revenew with any information about the 2015 volume discounts.

¶ 39     Moore received an email in June 2016 from ComEd regarding 2015 volume discounts. The spend amount was the number submitted by D. Construction through Perfect Commerce. The total volume discount was $1,006,212.57. Moore testified that when he received this email he did not know if the numbers were correct as he did not know which agreement to use for calculations. Moore reached out to ComEd to resolve the issue and did not get a response. D. Construction "just picked one [of the rate tables]." Moore testified that he did not have ComEd's spend reports and he did not know which discount rate ComEd was applying. At some point, ComEd gave D. Construction a deadline to make payment. Moore testified he was "directed to pay it and work it out." Moore took this "[t]o mean it would get caught either in the audit or future invoice when we met with them once we finally figured out what [the rate] was going to be." Based on that conversation, Moore approved the 2015 volume discount amount.

¶ 40    Moore was also involved in the 2016 volume discounts. D. Construction did not provide a spend number for 2016. Moore testified that he did not know how ComEd calculated the spend number. He reached out to ComEd and did not receive a response. Moore testified that D. Construction paid the 2016 volume discount because "[w]e were hit with the same set of circumstances, this needs to be paid or we [ComEd] are not going to cut you contracts anymore."

¶ 41    On cross-examination, Moore testified that an invoice was not open into perpetuity, rather it would be adjusted in the audit process or in a future invoice. Moore testified that during the audit process invoices were not changed. Any party that owed money would "write a check to correct the culmination of the invoices." Moore clarified that the 2015 volume discount amount was based on the spend amount and tiers submitted by him. D. Construction eventually paid the amount. For the 2016 volume discount, ComEd created the table containing the spend amount and volume discount. Moore testified that D. Construction did not provide its own version because ComEd did not ask. D. Construction came up with a different spend amount, but it did not give this number to ComEd. D. Construction agreed to the volume discount amount calculated by ComEd.

¶ 42    Admitted designations in deposition transcripts were admitted at trial. In the admitted designations of Edward Finnegan, an employee of ComEd. He testified that ComEd and Exelon audited their suppliers because it was good practice as there can be billing mistakes or misunderstandings. The audits allowed the parties to catch discrepancies. The purpose of the audits was to ensure compliance with contractual terms.

¶ 43    Finnegan was involved in the 2012 audit of D. Construction. At the time, he was overseeing the audit for Exelon. Finnegan was also involved in the 2016 audit of D. Construction. At the time, Finnegan was the manager over the construction services group for Exelon, and he had an oversight role during the audit. During the audit process, the auditors keep a ledger of any misbillings. ComEd and Exelon will then have further conversation with the supplier. Once there is a final agreement of the payment amount and there is final disposition of funds, the audit is complete.

¶ 44    With respect to the 2015 and 2016 volume discounts, Finnegan was manager over the group that was doing approximately 75 to 90 volume discounts with suppliers. There was a standard

practice where information was collected, and then payment total amounts were compared against the contractual percentages based on the spend amount. Finnegan's staff would work directly with suppliers to get agreement on the volume discount. Once both sides agreed, payment was made. The 2015 volume discount was calculated by Megan Smolinski. Finnegan did not have any discussions with Smolinski about the calculations of the discount. Finnegan's understanding was that the volume discount was to be calculated using the total spend amount for all contracts with D. Construction.

¶ 45    For the 2016 volume discount, Finnegan's involvement was the same as the 2015 discounts. Finnegan believed the amount sent to D. Construction was an accurate calculation based on the math and the contract between the parties. Finnegan testified that when Harr said "we are in agreement," he concluded that Harr had everything he needed for the spend amount calculations.

¶ 46    In 2018, D. Construction requested additional information from ComEd regarding the volume discount calculations. Volume discounts were not part of Revenew's audit process as the "volume discount process [was] very complex." Finnegan testified that any issues with volume discounts were handled separately between the parties.

¶ 47    At the close of D. Construction's case, ComEd moved for directed findings on all three counts. Concerning the Bellwood Red Bus project, ComEd argued that D. Construction failed to make a *prima facie* showing. ComEd argued that the Agreements required D. Construction to submit a change order within a prescribed amount of time and there was no course of dealing relating to change orders. The circuit court granted ComEd's motion for Count I as to the Bellwood Red Bus project.

¶ 48    ComEd's first witness was Kenneth Wendt. Wendt worked as an engineer for ComEd and was, at the time of trial, a senior manager of transmission and substation projects. From 2015 to 2018, Wendt was a senior manager, and he worked with D. Construction on projects. At the time of the termination of the Agreements, there were approximately 20 to 30 uncompleted projects. Wendt testified that during the transition process the parties wanted to look at what work was done, pay for that work, and transition the work to another contractor. The project management team did

walk-downs at each site looking at completed work. ComEd asked D. Construction to submit final billing for these projects. Wendt testified that ComEd agreed with most of these invoices, but there were a few projects that needed more explanation for the amount billed prior to final payment. The parties went back and forth for months trying to come to an agreement on the earned value for these projects.

¶ 49    At the time of termination, the Calumet Lighting project had not been started. The Calumet Lighting project was at the same location as the Calumet Fencing project. ComEd paid the invoice for the Calumet Lighting project. When ComEd asked for more information regarding the amount D. Construction paid for the materials, it did not receive any documentation. Wendt testified that D. Construction only provided 20 to 30 percent of the material required for this project. ComEd did not agree with D. Construction's earned value amount for line 27, which was for installing one of the lighting fixtures. D. Construction estimated it had completed about 50 percent of this line item. Wendt testified that ComEd did not agree with this amount as work had not started on this project and a fraction of the materials had been provided. Because ComEd did not get the requested information about the material costs, its estimators looked at catalogs to get prices to calculate an estimated value.

¶ 50    Similarly, work had not started on the Northwest Lighting project. ComEd paid two invoices for this project amounting to $272,900. Wendt testified that ComEd paid these invoices even though work had not started because its contractors forecast what they intend to complete or material received on a monthly basis. The earned value for this project was based on materials received. Wendt testified that ComEd learned the materials it paid for were not ordered until June and July 2018. Wendt explained there were different lead times, the time it takes from when an order is placed until it is received, for major materials and minor materials. Major materials include large transformers, breakers, electronics, and relay panels. Minor materials include pipe, conduit, fittings, and mounting materials. Major materials have longer lead times.

¶ 51    ComEd asked D. Construction for information regarding how much it spent on materials. ComEd was able to receive this information from the subcontractor that ordered the materials. The

materials were ordered on June 12, 2018. The invoice, dated June 20, 2018, for minor materials was initially rejected because they had not been ordered until after the contract was terminated. Wendt testified that ComEd had not received all materials D. Construction included in its earned value amount. ComEd believed it should get a credit for $184,200 in overpayment for this project.

¶ 52    For the remaining projects, Wendt testified that in order to estimate the earned value, a walk down with ComEd and D. Construction happened at each site and measurements were taken. Wendt testified that while he was not at these walk-downs, he participated in ComEd's internal meetings concerning the calculation of the earned value amounts. For the Calumet Fencing project, the parties disagreed on seven line items. Wendt testified that D. Construction only completed a portion of the driveway that was the equivalent to the surface area of a two-car garage. The driveway was "fairly long", and Wendt drew a demonstration of the length of the drive and the amount of work completed.

¶ 53    For the Itasca Fencing project, Wendt testified this substation was the equivalent to two to three football fields. ComEd estimated 42.7% of the work had been done based on the walk-down of the site. A number of line items were in dispute. For line 43, D. Construction's earned value 1418%, and ComEd's was 100%. Wendt testified that 100% is what was promised in the bid sheet. If there was a large discrepancy, then a change order would be required. Wendt testified that he was not aware of a change order for this line item.

¶ 54    Finally, for the Des Plaines Floodwall project, ComEd estimated that 26% of the work was completed. For the Wilton Center project, ComEd estimated that 90% of the work had been completed, and it paid D. Construction approximately $2.5 million.

¶ 55    On cross-examination, Wendt agreed that in the absence of a change order, ComEd paid the lump sum of a contract upon the completion of the project. Wendt testified that while he was not directly involved with the Des Plaines Floodwall project or the Wilton Center project, he was involved in discussion after termination regarding calculating the earned value for those projects. The invoice for the Calumet Lighting project included $283,000 for another project. Both parties agreed to the amount of minor materials for the Calumet Lighting project; however, when ComEd

tried to calculate the value, it did not get an answer from D. Construction, so it estimated the fair value from catalogs. ComEd added a 5% markup for the materials in its final amount. ComEd agreed to pay D. Construction for the light fixtures, which were received after the contract was terminated. However, ComEd did not want to pay for minor materials which were ordered after termination.

¶ 56     Finally, D. Construction called LaPoint as a rebuttal witness. LaPoint testified that at the time D. Construction bid on the Northwest Lighting project, full plans were not available. The units provided in the bid were provided by ComEd. D. Construction's subcontractor purchased the materials for the project. LaPoint testified that D. Construction provided ComEd with the material necessary to complete the project. An inventory sheet of material was provided at termination. LaPoint testified that, prior to termination, there was a design change and that more material was needed for the project. LaPoint testified that D. Construction did not furnish the concrete for the project, and it did not deduct the value of the concrete from the earned value calculation. LaPoint also testified that D. Construction did not furnish the stone needed for the project, and it did not deduct the value of the concrete from the earned value calculation. LaPoint stated that "the stone for these projects is almost considered incidental, typically it is such a low cost, low quantity item."

¶ 57     LaPoint testified the units on the pricing sheet for the Calumet Lighting project were provided by ComEd. D. Construction purchased the material through a subcontractor. LaPoint testified that D. Construction did not furnish the concrete for the project, and it did not deduct the value of the concrete from the earned value calculation. LaPoint also testified that D. Construction did not furnish the stone needed for the project, and it did not deduct the value of the concrete from the earned value calculation for the same reason as the Northwest Lighting project. The scope of this project changed around the same time as Northwest Lighting.

¶ 58     On March 21, 2024, the circuit court entered its order finding that D. Construction was entitled to partial recovery on Count I. The court found that D. Construction had met its burden and showed it was entitled to additional payment on the Des Plaines Floodwall project and the Itasca Fencing Project, and it did not meet its burden for the other projects. The circuit court also

found that D. Construction was entitled to no recovery on Counts II and III. The court also found in favor of ComEd on its counterclaims for the 2017 and 2018 volume discounts and payments made on the Northwest Lighting Project and Calumet Lighting Project.

¶ 59    Following the entry of the trial order, ComEd filed a motion to confirm prejudgment interest. ComEd argued that the relevant question was when each of the amounts in the trial judgment became due under the Agreements. ComEd argued that the Agreements provided it with a right to setoff, and the prejudgment interest should be calculated when the amounts were due under the Agreements and not based up when they became due under the trial order. ComEd also argued that D. Construction was not due prejudgment interest. On May 30, 2024, the circuit court denied the motion as it found that ComEd waived this issue by not raising it at trial.

¶ 60    This appeal and counter-appeal timely follow.

¶ 61                            II.  ANALYSIS

¶ 62    On appeal, D. Construction argues that the circuit court erred when it dismissed count IV of its complaint, erred in granting partial summary judgment in favor of ComEd, erred in granting ComEd's motion for directed finding, erred in ruling against D. Construction on claims relating to partially completed projects, erred in finding the voluntary payment doctrine barred its recovery of volume discounts and prompt payment discounts, and it erred when it ruled in favor of ComEd on its counterclaims. On cross-appeal, ComEd argues the circuit court erred in determining prejudgment interest.

¶ 63                         A.  Motion to Dismiss

¶ 64    A section 2-615 motion to dismiss "tests the legal sufficiency of the plaintiff's complaint, asking whether the allegations in the complaint, construed in the light most favorable to the plaintiff, state sufficient facts to establish a cause of action upon which relief may be granted." *Project44, Inc. v. FourKites, Inc.*, 2024 IL 129227, ¶ 18. The court must "accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts." *Marshall v. Burger King, Corp.*, 222 Ill. 2d 422, 429 (2006). An exhibit attached to a complaint is incorporated

into the complaint, and "[w]here an exhibit contradicts the allegations in a complaint, the exhibit controls." *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 18. Our review of a dismissal pursuant to section 2-615 is *de novo*. *McCleary v. Wells Fargo Securities, L.L.C.*, 2015 IL App (1st) 141287, ¶ 15.

¶ 65 The rules of contract interpretation are well settled, and the primary objective in construing a contract is to give effect to the parties' intent. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). "A court must initially look to the language of the contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id.* at 233. "Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Id.* "The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Id.* "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011).

¶ 66 "It is a fundamental principle of contract law that 'an instrument may incorporate all or part of another instrument by reference.' " *Unifund CCR Partners v. Shah*, 407 Ill. App. 3d 737, 743 (2001) (quoting *Provident Federal Savings & Loan Ass'n v. Realty Centre, Ltd.*, 97 Ill. 2d 187, 192-93 (1983)). "However, the reference must demonstrate 'an intention to incorporate the document and make it part of the contract.' " *Id.* (quoting *Arneson v. Board of Trustees*, 210 Ill. App. 3d 844, 849-50 (1991)). Contracts that specifically incorporate other documents by reference are to be construed as a whole with those other documents. *Wiczer v. Wojciak*, 2015 IL App (1st) 123753, ¶ 36.

¶ 67 In its complaint, D. Construction alleged that the early completion incentives in Event 6130 and Event 029 were binding because they were incorporated by reference into each FEP contract. Event 6130 was incorporated by reference for work done from 2014-2016, and Event 029 was incorporated by reference for work done from 2017-2018.

¶ 68 D. Construction contends that Event 6130 was incorporated by reference. For work done between 2014-2016, the contracts attached to the second amended compliant contain the following

language: " 'D' Construction, Inc. will furnish materials, labor, equipment, and supervision to complete the project scope as defined by ComEd Perfect Commerce Event 6130," "This Work is awarded to D. Construction Inc. pursuant to RFP Perfect Commerce Event 6130," or "Scope: Defined by ComEd Perfect Commerce Event 6130." These contracts also state, "All work performed under this Blanket Contract will be governed by the Terms and Condition [*sic*] of the master Agreement for Materials and Services by D. Construction, Inc. and Commonwealth Edison, Company, acting through its Agent, Exelon BSC dated May 12, 2014."

¶ 69    Here, the parties indeed incorporated by reference the 2014 Master Terms. Section 5.1 of the 2014 Master Terms states:

> "In consideration for the Contractor's acceptable performance of the Work as set forth in the Purchase Order and other Contract Documents, Buyer will pay the Contractor the Contract Price provided in the Purchase Order. Unless otherwise expressly provided in the Purchase Order, the Contract Price shall be a fixed price and include all costs associated with performance of the Work in compliance with the Contract Documents * * * Except otherwise expressly provided in the Purchase Order, the Contract Price shall be the sole and exclusive consideration for Contractor's satisfactory performance of the Work."

Further, section 2.3 states:

> "These Terms and Conditions shall apply to each Purchase order unless specifically modified in the Purchase Order. These Terms and Conditions supersede any preprinted terms or conditions on any preprinted purchase order or any printed or typed conditions forming a part of the Contractor's proposal. Any additional or different terms and conditions set forth in Contractor's proposal or preprinted purchase orders, Contractor's Purchase Order acknowledgments, or similar writings, or in Contractor's invoice or electronic data interchange

acknowledgments, or any attempt by Contractor to vary in any degree any of the terms in the Contract Documents are objected to by Buyer and will not be binding upon Buyer unless specially assented to in writing by Buyer's Designated Representative."

¶ 70    Finally, section 30.1 of the Master Terms states: "The Purchase Order, these Terms and Conditions, any Change Orders, and any other Contract Documents specifically referenced in any of the foregoing sets forth the entire contract of the Parties, and supersedes any and all prior agreements, arrangements, or understandings, relating to the subject matter hereof."

¶ 71    D. Construction contends that Event 6130 was incorporated by reference in each binding FEP contract. Event 6130 was a request for proposal, which was not a binding contract. *Ace Coffee Bar, Inc. v. University of Illinois*, 51 Ill. Ct. Cl. 395, 400-01 (1999). Event 6130 included section 201.0 entitled "SCOPE OF WORK." Within this section is subsection 201.17, which includes early completion incentives. However, it also includes subsection 201.3, entitled "Scope of Work". This subsection detailed the work ComEd wanted completed.

¶ 72    Section 2.3 of the 2014 Master Terms states that the Master Terms supersedes any additional or different terms in the contractor's proposal. Therefore, even if the contracts incorporated by reference all of section 201.0 of Event 6130, scope of work, as referenced in the FEP contracts, is limited by the 2014 Master Terms. "Scope of Work," as defined by Article 1 of the 2014 Master Terms, means "the description of the Work to be provided by Contractor as set forth in the Purchase Order and other Contract Documents." Finally, "Work" means "all Material, Services, and Submittals required to be provided by Contractor under the Purchase Order and its associated Contract Documents including re-work and warranty work." Therefore, "scope of work," as referenced in the FEP contracts, is limited to the work, including materials and services, to be done by D. Construction and does not include early completion incentives. D. Construction contends that all of section 201.0 of Event 6130 was incorporated by reference into each contract. However, when looking at the language of the 2014 Master Terms and the language of the contracts, the

references to scope as defined by Event 6130 were limited to section 201.3, which did not reference early completion incentives.

¶ 73    Similarly, D. Construction also contends that Event 029 was incorporated by reference in each FEP contract for work done from 2017-2018. Again, Event 029 was a request for proposal, which was not a binding contract. *Ace Coffee Bar, Inc.*, 21 Ill. Ct. Cl. at 400-01. The contracts attached to the second amended complaint include the following language: " 'D' Construction, Inc. hereby proposes to furnish material, labor, equipment, and supervision for the project scope as defined by Exelon Utilities Substation Facilities 000029 sourcing event initiated by Peter Della Vedova and Michael Petty in October of 2016." These contracts also include language stating, "All agreed upon/executed Exelon Terms and Conditions apply to this contract or contract release." Like Event 6130, Event 029 includes section 201.0 entitled "SCOPE OF WORK." There is a subsection 201.1, "Description of Work," which detailed the work Exelon sought to have done under the Facility Enhancement Program. This subsection does not include early completion incentives. As with Event 6130, the 2017 Master Terms defined scope of work and work. The references to Event 029 in the contracts were limited to the subsection detailing the scope of work as defined by the 2017 Master Terms and do not include early completion incentives.

¶ 74    Accordingly, we find the exhibits attached to D. Construction's second amended complaint contradict its allegations that early completion incentives were incorporated by reference into the FEP contracts.

¶ 75                    B.  Motion for Summary Judgment

¶ 76    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). The court may grant partial summary judgment if "there is no genuine issue of material fact as to one or more of the major issues in the case, but  * * *  substantial controversy exists with respect to other major issues." *Id*. § 2-1005(d). "A genuine issue of material fact exists where the

facts are disputed or where reasonable minds could draw different inferences from the undisputed facts." *Nine Group II, LLC v. Liberty International Underwriters, Inc.*, 2020 IL App (1st) 190320, ¶ 34. Summary judgment is a drastic remedy and should be granted only where the movant's right is "so clear as to be free from doubt." *Community Bank of Greater Peoria v. Carter*, 282 Ill. App. 3d 505, 508 (1996). We review a trial court's entry of summary judgment is *de novo*. *Id*.

¶ 77 When termination is for convenience, Section 18.4.2 of the Master Terms provides:

"Buyer will pay Contractor for all reasonable and unavoidable disbursements and expenses that Contractor incurred or become obligated for prior to the date of the notice of termination. Buyer will be entitled to all Material specially accumulated for the Work terminated, shipped at its expense to a place designated by Buyer. In no event will the aggregate termination charges plus payment for the Work exceed the Contract price for the Work set forth in the relevant Purchase Order and Change Orders thereto. Payments by Buyer hereunder will be credited with: (1) prior amounts deposited or paid by Buyer under the Purchase Order, and (2) the amount any salvage or resale value which may be realized with respect to any Material purchased or manufactured for the purpose of performing the Work and identified prior to termination, which Buyer does not elect to take. If the sum of all previous deposits and payments under the Purchase Order and salvage and/or resale with respect to the Work terminated exceeds the amount owed to Contractor hereunder, the excess will be immediately refunded to Buyer."

¶ 78 Section 18.5 of the Master Terms states:

"Whether Buyer terminates the Purchase Order with or without cause or suspends Contractor's Work, in no event will Buyer be responsible for overhead costs associated with Work not performed by Contractor, for any profits Contractor would have earned if it had

completed Work, or for any special, consequential, incidental, or indirect damages."

¶ 79   D. Construction argues that these sections are inapplicable and do not place limitations on damages. However, these sections do set limitations. "Contract interpretation is appropriate for disposition by summary judgment." *RDC Case Creek Trails, LLC v. Metropolitan Airport Authority of Rock Island County*, 2020 IL App (3d) 190083, ¶ 14. As noted above, the court's primary objective in construing a contract is to ascertain and give effect to the intent of the parties. *Thompson*, 241 Ill. 2d at 441; *Gallagher*, 226 Ill. 2d at 232. Reading these sections, and the Master Terms as whole, the intent of the parties was to clearly delineate financial obligations upon termination. The plain language of sections 18.4.2 and 18.5 limit what D. Construction could recover upon termination of the contracts.

¶ 80   D. Construction's main contention is whether those limitations apply. That, however, was not the issue. The only question before the court was, as a matter of law, do sections 18.4.2 and 18.5 unambiguously show the intent of the parties with regard to compensation following termination for convenience. The circuit court found these sections were "relevant, clear, and unambiguous and [were] subject to the application for consideration of the damages asserted by Plaintiff." We agree. These sections served to limit the amount recoverable by D. Construction. The amount of recoverable damages is a question for the trier of fact. *Tri–G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 252 (2006) ("while the amount of recoverable damages is a question of fact for the jury, the measure of damages upon which the jury's factual computation is based is a question of law for the court."). Accordingly, we find that the circuit court did not err in granting partial summary judgment.

¶ 81                    C.  Motion for Directed Finding

¶ 82   During the trial, the circuit court granted ComEd's motion for a directed finding on Count I with respect to the Bellwood Bus project. "In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor." 735 ILCS 5/2-1110

(West 2020). In ruling on a motion for a directed finding, the court must engage a two-step analysis. "First, the court must determine, as a matter of law, whether the plaintiff has presented a *prima facie* case by proffering at least 'some evidence on every element essential to [the plaintiff's underlying] cause of action.' " *In re Estate of Coffman*, 2023 IL 128867, ¶ 52 (quoting *Kokinis v. Kotrich*, 81 Ill. 2d 151, 154 (1980)). Second, if the plaintiff satisfies this burden, the court must consider "the totality of the evidence presented, including any evidence that is favorable to the defendant." *Id*. ¶ 53. After weighing the evidence, if "the court determines that the evidence warrants a finding in favor of the defendant, it should grant the defendant's motion and enter a judgment dismissing the action." *Id*. ¶ 54. If the circuit court finds that the plaintiff failed to make a *prima facie* case as a matter of law, the standard of review is *de novo*. *Id*. ¶ 52. However, if the circuit court moves on to the second part of the analysis, we will not reverse the court's ruling unless it is against the manifest weight of the evidence. *Id*. ¶ 54.

¶ 83    We note that both parties analyze this issue under the manifest weight of the evidence. However, based on our review of record, we find that the circuit court did not engage in the second step of the analysis. In its oral ruling, the circuit court did not weigh or draw inferences from the evidence, nor did it analyze credibility of witnesses. Therefore, we will review the circuit court's decision *de novo*.

¶ 84    To succeed on a breach of contract claim, the plaintiff must show (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach of contract by the defendant, and (4) resultant injury to the plaintiff. *Zahdan v. Frontline Business Enterprise Inc*., 2024 IL App (1st) 221351, ¶ 31. Section 12.1 of the 2017 Master Terms provides: "No Change Order that is a Material Change will be binding upon the Parties unless the same is approved in writing by Buyer and Contractor." Material Change, as defined by the 2017 Master Terms, means "a Change Order that has the effect of changing the cost to Buyer or Contractor (whether because of a change in the prices  for the Material or the Services, the amount or type of Material or the scope of the Services, or otherwise), or materially affecting the time for performance, warranties, or other obligations of the Parties."

¶ 85    D. Construction contends ComEd waived its right to require a written change order. It cites a number of cases to support this argument. However, D. Construction does not argue that it was not paid as required by the written contract, as at trial it acknowledged that ComEd denied the contested change orders. Rather, its claim is that it should be paid for the work done in the denied change orders. In order to receive compensation for extra work, D. Construction must prove that "(1) the work was outside the scope of the construction contract; (2) the extra items were ordered by the owner; (3) the owner agreed to pay extra, either by his words or conduct; (4) the extras were not furnished by the contractor as his voluntary act; and (5) the extra items were not rendered necessary by any fault of the contractor." *A.W. Wendell and Sons, Inc. v. Qazi*, 254 Ill. App. 3d 97, 104 (1993) (citing *Berg & Associates, Inc. v. Nelsen Steel & Wire Co.*, 221 Ill.App.3d 526, 535 (1991)). There must be clear and convincing evidence that the items were for extra work, and that the owner ordered the extra work, agreed to pay, and waived the necessity of a written change. *Id*. (citing *R & R Construction Co. v. Junior College District No. 529*, 55 Ill.App.3d 115, 118 (1977)). "The contractor sustains this burden by proving that the extra work was requested by the owner, and there is no evidence indicating that the work was necessary or voluntarily performed due to fault by the contractor." *Id*. at 105.

¶ 86    It is apparent that D. Construction did establish by clear and convincing evidence of the elements a *prima facie* case for extra work. Notably, while two change orders were at issue, D. Construction provided no testimony or evidence regarding the work done for the manholes. Regarding second drill shaft, LaPoint testified that concrete that was set to expire was shoveled into the initial drill shaft "making it a bad drill shaft." LaPoint testified that the concrete was put into the drill shaft by a third-party company that was on site. In its brief, D. Construction asserts "ComEd told Mr. LaPoint that ComEd would pay for the work to induce D. Construction to perform the work without taking the time to get a change order" and "LaPoint testified that a ComEd manager specially asked him to perform the additional Work for the Bellwood Project." However, the record does not support these assertions; in fact, it shows the opposite:

"Q. And who asked you to do the work to re-drill that shaft?

A. It would have been through their project management department.

Q. Do you remember who it was?

A. It would have had to have been Hareet.

Q. And did he tell you that you would be paid for that work?

A. He did not."

¶ 87     There was no indication that ComEd specially asked D. Construction to perform the work and there was no evidence that ComEd expressly or impliedly agreed to pay. Further, D. Construction did not show that ComEd waived the necessity of a written change order. Testimony during D. Construction's case showed that following termination of the Agreements, D. Construction submitted eight change orders for this project—six were approved and two were denied. D. Construction submitted change orders for the work at issue and ComEd denied them. Accordingly, as D. Construction did not establish elements for a *prima facie* case, we find the circuit court's directed finding in favor of ComEd was proper.

¶ 88                                  D.  Post-Trial Order

¶ 89     Following a bench trial, a judgment will only be reversed if it is against the manifest weight of the evidence. *Wiczer v. Wojciak*, 2015 IL App (1st) 123753, ¶ 32 (citing *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d, 849, 859 (2008)). "A judgment is against the manifest weight of the evidence only if the opposite conclusion is apparent or when the trial court's findings appear to be arbitrary, unreasonable, or not based on the evidence." *Id.* We give great deference to the circuit court's decision as it is in the better position to determine witness credibility, and "[w]e will not disturb a trial court's judgment as long as there is evidence to support the judgment." *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 25. Additionally, "[u]nless the opposite conclusion is evident from the record, the reviewing court will not substitute its judgement for that of the trier of fact on matters of credibility of a witness, weight of evidence and the inferences drawn from the evidence." *1472 N. Milwaukee, Ltd. v. Feinerman*,

2013 IL App (1st) 121191, ¶ 21. "[W]e may affirm the judgment of the trial court on any basis in the record, regardless of whether the trial court relied upon that basis or whether the trial court's reasoning was correct." *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 734 (2009).

¶ 90                                                    1. Count I - Earned Value

¶ 91        On appeal, D. Construction challenges the circuit court judgment relating to Count I of its complaint. Namely, D. Construction contends the court gave more credibility to the testimony of Wendt than LaPoint when determining the earned value amounts of the projects. However, in making its arguments D. Construction ignores "the well-established legal principal that the trier of fact, in this case an experienced trial judge, is free to accept or reject testimony and give whatever weight it deems appropriate to the evidence submitted." *Northwestern Memorial Hospital*, 2014 IL App (1st) 133008, ¶ 26. We will not substitute our judgment for that of the circuit court's "on matters of credibility of a witness, weight of evidence and the inferences drawn from the evidence" unless the opposite conclusion is evident from the record. *1472 N. Milwaukee*, 2013 IL App (1st) 121191, ¶ 26.

¶ 92        As previously discussed, to succeed on a breach of contract claim, the plaintiff must show (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach of contract by the defendant, and (4) resultant injury to the plaintiff. *Zahdan*, 2024 IL App (1st) 221351, ¶ 31. Damages for breach of contract must be proved with reasonable certainty and cannot be based on conjecture or speculation. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 107 (2006). If there is an adequate basis in the record to support the trial court's determination of damages, then we must affirm. *1472 N. Milwaukee*, 2013 IL App (1st) 121191, ¶ 13

¶ 93                                                       i. Wilton Center

¶ 94        ComEd paid D. Construction $2,498,890.31 for the Wilton Center project. D. Construction estimated the project was 98% complete and the earned value was $2,675,646.63.

¶ 95        The circuit court found that D. Construction had not demonstrated it was entitled to additional payment. The parties were in dispute over 24 line items. At trial, LaPoint only testified to two of

the disputed line items. D. Construction's earned value amount for these two line items exceeded 100%. LaPoint testified that D. Construction completed additional work and he determined D. Construction was owed $258,000. This additional amount would have exceeded the contracted amount. LaPoint asserted that it was "not uncommon" for the parties to negotiate change orders after the fact. However, LaPoint conceded that no change order had been submitted or approved for the additional work.

¶ 96    For line item 43, LaPoint testified that ComEd's on-site project manager told D. Construction to do the extra work. LaPoint testified that the project manager "assured [D. Construction would get paid for it all." For line item 71, LaPoint testified that the on-site project requested the extra work and it was D. Construction's "understanding [it] would get paid extra for it." Per LaPoint, the extra work would not have been done if D. Construction had not been told it would be paid for it. D. Construction showed by clear and convincing evidence that ComEd requested the extra work and agreed to pay, and the extra work was not due any fault of D. Construction.

¶ 97    However, while parties to a contract may orally modify or alter its terms, "before a contractor is entitled to compensation for the extras, the waiver must be proved by clear and convincing evidence." *Duncan v. Cannon*, 204 Ill. App. 3d 160, 168 (1990). In its order, the circuit court agreed with ComEd's argument "that the change order was required and since there was no change order [D. Construction] was not entitled to payment that exceeds the original estimate." There was no testimony or evidence presented at showed ComEd waived the requirement for a written change order. LaPoint testified that a written change order had not been submitted. Wendt testified that for "something this large" a written change order would have been required. Testimony and evidence showed that other change orders were submitted and approved or denied following termination. Without a change order, D. Construction was not entitled to payment for the extra work.

¶ 98    For the remaining 22 line items at issue, there was no testimony regarding the other line items in dispute and the earned value calculations. Accordingly, we conclude that the court's finding that D. Construction did not meet its burden was not against the manifest weight of the evidence.

¶ 99                              ii.  Des Plaines Floodwall

¶ 100        The lump sum amount for this project was $4,618,789.50. ComEd had paid $1,101,819.48. D. Construction argued the earned value of the work performed was $1,285,700.20 – a difference of $183,880.72. This project had 55 line items and nine line items were in dispute. LaPoint only testified to two of those disputed line items. LaPoint testified D. Construction was entitled to $276,000. LaPoint testified that he conducted a walk down of the project and that he relied on his memory of the walk down when determining the earned value. On cross-examination, LaPoint agreed that 26% of the project had been completed.

¶ 101        In its judgment the circuit court found that LaPoint's testimony could not be reconciled with the numbers and "his testimony alone [did] not establish that ' $276,000 and some change ' is still owed." If 26% of project was completed, D. Construction was entitled to $1,200,885.28. The circuit court found that D. Construction was entitled $99,065.79 – the difference between what it was entitled and the amount already paid by ComEd. The court's finding was not against the manifest weight of the evidence.

¶ 102                             iii.  Itasca Fencing

¶ 103        The lump sum amount for this project was $2,990,785.79. ComEd had not paid D. Construction but it estimated the earned value to be at least $1,761,067.59. D. Construction estimated the earned value at $1,992,473.62. There were 49 line items, with 7 in dispute.

¶ 104        LaPoint testified that he performed a walk down of this project and calculated the earned value. D. Construction argues the amount awarded does not fully compensate it for the work done. D. Construction's argument hinges on the circuit court's consideration on weight of the evidence. Wendt testified ComEd calculated that the project was 42.7% complete. At trial, ComEd admitted the earned value was at least $1,761,067.59.

¶ 105        The circuit court found that, after weighing the testimony of LaPoint and Wendt, it could not conclude that either party's estimate was correct. It also found that D. Construction had not met its burden and awarded D. Construction $1,761,067.59 based on ComEd concession. D. Construction argues the amount awarded does not fully compensate it for the work done. Its argument hinges

on the weighing of the testimony of the witnesses. We will not substitute our judgment on the weight of evidence for that of the circuit court's. See *1472 N. Milwaukee, Ltd.*, 2013 IL App (1st) 121191, ¶ 21. Therefore, the court's finding was not against the manifest weight of the evidence.

¶ 106                                    iv.  Calumet Fencing

¶ 107      The lump sum amount for this project was $8,156,566. ComEd paid $3,629,069.71. D. Construction estimated the earned value was $3,916,915.48. The project had 88 line items and seven were in dispute. Again, LaPoint testified that he performed a walk down of this project and calculated the earned value. Regarding the driveway, LaPoint testified that D. Construction "construct[ed] that driveway in accordance with engineering plans." Wendt testified that ComEd based its earned value calculation on the number of fence posts installed. Wendt testified that only a portion of the driveway had been completed.

¶ 108      The circuit court found that while both LaPoint and Wendt were credible, D. Construction had to demonstrate that it was "more probably true than not that the disputed work was completed." The court's finding was not against the manifest weight of the evidence.

¶ 109                                    v.  Northwest Lighting

¶ 110      The lump sum amount for materials was $537,125.47. ComEd paid $272,900. D. Construction argued its earned value was $544,000, which included all materials required to complete the project and $7,200 for preliminary work. At the time of termination, no work had begun on the project, but D. Construction ordered materials.

¶ 111      D. Construction asserts that evidence established that it was entitled to an additional $271,000 for materials and $7,200 for preliminary work. It bases its argument on LaPoint's testimony. LaPoint testified that all materials had been provided to ComEd. However, the circuit court found that LaPoint's answer "lack[ed] confident credibility." We will not substitute our judgment for that of the circuit court's regarding witness credibility. *1472 N. Milwaukee, Ltd.*, 2013 IL App (1st) 121191, ¶ 21. The circuit court also found that it could not give value to any materials provided to ComEd as D. Construction did not provide documentation showing how much it paid for the

materials. Further, evidence admitted at trial and Wendt's testimony showed that the materials were ordered after the Agreements were terminated. The Agreements allowed for payment for reasonable expenses incurred prior to termination. As there was no evidence showing how much D. Construction spent on the materials and evidence showed the materials were ordered after termination, the court's finding was not against the manifest weight of the evidence. See *Razor*, 222 Ill. 2d at 107; see also *Snelson v. Kamm*, 204 Ill. 2d 1, 33 (2003) ("[I]n proving damages, the burden is on the plaintiff to establish a reasonable basis for computing damages.")

¶ 112      Accordingly, we find the circuit court's award of $1,860,133.38 for Count I was not against the manifest weight of the evidence.

¶ 113                            2.  Count II: 2015 and 2016 Volume Discounts

¶ 114      D. Construction argues that the court's ruling in favor of ComEd for 2015 and 2016 volume discounts was against the manifest weight of the evidence and it was not barred from recovery.

¶ 115      The voluntary payment doctrine embodies "the ancient and universally recognized rule that money voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment cannot be recovered back on the ground that the claim was illegal." (Internal quotation marks omitted.) *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶ 22. To avoid application of the doctrine, a plaintiff must show that that payment was based on necessity, duress, fraud, or misrepresentation or mistake of fact. *Id*. ¶¶ 23-24.

¶ 116      The record contradicts D. Construction's contentions that it did not have knowledge of all the facts prior to payment. The record shows that D. Construction made payments without protesting the volume discount amounts. ComEd sent D. Construction an email containing the 2015 spend amount, which was submitted by D. Construction, and the volume discount tiers. ComEd asked D. Construction to confirm its agreement with the stated amount and ask questions. D. Construction, through Moore, responded that it was in agreement and paid the amount. D. Construction argues that it did not have all the information it needed to calculate the volume discounts. It points to Moore's testimony that that he did not know how ComEd calculated the

2015 volume discounts and he did not receive an answer from ComEd regarding this issue. This argument is refuted by Moore's testimony on cross-examination:

"Q. You don't see the tiers that are in [Smolinski's] chart?

A. She did not fill that table out.

Q. Someone else filled the table out?

A. I did.

Q. I am sorry. The table for 2015 you filled out and put the tiers in?

A. That is correct.

Q. And then she is sending you the corresponding calculation based

on the table you provide?

A. Correct."

Further, Male was involved with invoicing for the projects, and he created a master spread sheet tracking invoices and payments. Moore testified that anyone could request the master spreadsheet created by Male.

¶ 117     Similarly for the 2016 volume discount, ComEd email D. Construction the spend amount and volume discount. ComEd also asked D. Construction to send its "estimated spend and supporting documentation if it varies from our total." Emails admitted into evidence showed that D. Construction calculated a different spend amount; however, it did not express to ComEd that it disagreed with its amount. Instead, D. Construction, through Harr, responded that it was in agreement and paid the amount volume discount calculated by ComEd. Moore's testimony reiterated that D. Construction did not tell ComEd that it calculated different spend amounts.

¶ 118     Additionally, D. Construction relies on the testimony of Residori that she could not verify the volume discounts. Residori began working for D. Construction after these discounts were paid. In making its finding, the circuit court gave less weight to the testimony of Residori as she was not directly involved with these volume discounts. The court found that "Moore, Male, and Harr were involved during the contract period, had knowledge of matters, and agreed to the discounts taken. Moore agreed to the amount of the 2015 discount and Harr agreed to the 2016 discount." As

previously discussed, this court will not substitute its judgment for that of the circuit court's regarding witness credibility and weight of the evidence. *1472 N. Milwaukee, Ltd.*, 2013 IL App (1st) 121191, ¶ 21. The record does not reflect that D. Construction made the 2015 and 2016 payments based on compulsion, duress, fraud, misrepresentations, or a mistake of material facts, and they were made voluntarily. D. Construction had access to the necessary documentation prior to payment. See *Ergo v. International Merchant Services, Inc.*, 519 F. Supp. 22d 765, 774 (citing *Harris v. ChartOne*, 362 Ill. App. 878, 882 (2005)) (finding that when the defendant had possession of all the relevant information "failure to recognize error in making a voluntary payment does not constitute mistake of fact under the doctrine when the relevant facts were not obscured or inaccessible."). Notably, D. Construction received the discount amounts prior to making payment and did not contest the amounts, so it may not claim it paid too much. See *McIntosh*, 2019 IL 123626, ¶ 36 ("Where the nature and amount of a charge is fully disclosed, the plaintiff cannot successfully assert that he or she was operating under a mistake of fact with regard to the charge.").

¶ 119        D. Construction also argues that the voluntary payment doctrine does not apply because the volume discount payments were not final. It cites *Liberty Mutual Insurance Co. v. Zambole*, 141 Ill. App. 3d 803 (1986), to support its argument. In *Liberty Mutual*, the plaintiff, a workers' compensation insurer, filed suit to recover an arbitration award paid to an employee *Id.* at 804. The plaintiff promptly paid the award in order avoid to accrual of interest under section 19(n) of the Workers' Compensation Act. *Id.* After arbitration, the defendant filed for review before the Industrial Commission. *Id.* The commission reversed the arbitration award. *Id.* On appeal, the defendant argued that the plaintiff's payment was made voluntarily and made under a claim or right or under a mistake of the law; therefore, he was not required to return the money. *Id.* We found that the payment was made voluntarily and was not made pursuant to a mistake of law as the plaintiff knew the arbitrator's decision was not final and could be modified or vacated. *Id.* at 804-05. However, we affirmed the trial court's entry of summary of judgment in favor of the plaintiff. *Id.* at 105. Finding that "it is implied in section 19(n) of the Workers' Compensation Act that if funds have been tendered by the employer's insurer to avoid the accrual of interest pending

appeal by an employee seeking a higher award, upon reversal of the arbitrator's decision, such sum must be returned to the insurer." *Id.* at 805. This case does not support D. Construction's argument that the voluntary payment doctrine does not apply because the payment were not final. Even if the payments of the volume discounts were not final because they could be audited, D. Construction had knowledge of this prior to making payment. Therefore, the payments were voluntary. See *id.* at 804-05. Accordingly, the circuit court's finding in favor of ComEd was not against the manifest weight of the evidence. See *Alpha School Bus Co.*, 391 Ill. App. 3d at 734.

¶ 120                                            3. Prompt Payment Discounts

¶ 121       D. Construction argues that the circuit court erred in finding in favor of ComEd. D. Construction's argument for this issue is underdeveloped. D. Construction asserts that the circuit court erred for "same reasons that the Trial Court erred in finding in favor of ComEd on Count II." It provides no elaboration or argument for how the circuit erred. It makes a short one paragraph argument that the circuit court also erred as prompt payment discount are not applicable because they are based on terms from Event 6130. Furthermore, it does not cite any authority for these propositions.

¶ 122       Illinois Supreme Court Rule 341 requires that the argument in an appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). "It is well settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Supreme Court Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal." *Bank of America, N.A. v. Kulesza*, 2014 IL App (1st) 132075, ¶ 18. "A court of review is entitled to have the issues clearly defined and to be cited pertinent authority." (Emphasis omitted.) *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises*, 2013 IL 115106, ¶ 56. Accordingly, we deem D. Construction's argument pertaining to prompt payment discounts forfeited. See *Lake County Grading Co., LLC v. Village of Antioch*, 2014 IL 115805, ¶ 36.

¶ 123                                    4. ComEd's Counterclaims

¶ 124          Finally, D. Construction argues the circuit court erred when it ruled in favor of ComEd on its counterclaims. As to the counterclaim regarding earned value, D. Construction contends that ComEd failed to prove that it was overcharged on the Northwest Lighting Project and the Calumet Lighting Project. Specifically, ComEd did not met its burden of proving the amount it paid for the materials exceeded D. Construction's cost to acquire them. However, the record does not support D. Construction's argument.

¶ 125          As previously discussed, section 18.4.2 and 18.5 of the 2017 Master Terms entitle D. Construction to "reasonable and unavoidable disbursements and expenses * * * incurred * * * prior to the date of the notice of termination." D. Construction contends that ComEd cannot prove that the amount it paid for the materials exceeded D. Construction's cost to acquire them. As discussed above, D. Construction did not present any evidence or testimony regarding the amount it paid for the materials for the Northwest Lighting project. Wendt testified that ComEd paid two invoices for the Northwest Lighting project. ComEd asked D. Construction how much it spent on materials, but D. Construction did not provide the requested information. Wendt further testified that ComEd was able to get this information from the subcontractor that ordered the materials. The invoices for the materials were dated after the Agreements were terminated. ComEd previously paid D. Construction $272,900 for materials. ComEd did not receive all of the materials needed for this project. In emails following termination of the Agreements, ComEd agreed to pay D. Construction $88,700 for the light fixtures and sought a credit of $184,200. ComEd was not willing to pay for minor materials ordered after termination as these materials "could be obtained on short notice" and following termination "there was no reason to continue to order material and no additional material should have been ordered."

¶ 126          Regarding the Calumet Lighting project, Evidence admitted at trial showed ComEd paid $820,512.92 for materials. Wendt testified that D. Construction did not provide all of the materials needed to complete the project and ComEd had to purchase additional materials after the Agreements were terminated. ComEd did not agree with D. Construction's earned value

calculations and asked for information about how much it paid for the materials. D. Construction argues that ComEd "offered no evidence of D. Construction's cost on the material." This omission was due to D. Construction. Wendt testified that ComEd asked D. Construction for documentation showing how much it paid for the materials and ComEd did not receive the requested information. LaPoint testified that ComEd requested records regarding materials for the Calumet Lighting Project, but D. Construction did provide it. Wendt testified that when D. Construction did not provide this information, ComEd estimated the material costs from catalogs. Wendt testified that the estimated value was in the "$240,000 range." Accordingly, the circuit court's award of $184,200 for the Northwest Lighting project and $580,512 for the Calumet Lighting project was not against the manifest weight of the evidence.

¶ 127    Finally, D. Construction argues that there was no evidence to support the circuit court finding that ComEd was entitled to judgment on its counterclaim for 2017 and 2018 volume discounts. In October 2018, Smolinski sent an email with ComEd's 2017 and 2018 spend reports and volume discounts. ComEd sought $659,536.63 for 2017 and $83,347.08 for 2028. Residori testified that she was asked to verify these numbers by her boss, Harr. Residori concluded that there were errors in ComEd's calculations. Residori testified that some of the line items on the spend report were miscategorized and Exelon work was included on the spend report. Based on her calculations, ComEd was owed $32,169.63 for 2017 and $49,815.96 for 2018.

¶ 128    In making its findings, the court noted that it did not have the underlying work documents to confirm either party's calculations. The court found it was "more probably true than not" that ComEd was entitled to volume discount amounts as calculated in Smolinski's email, which was admitted into evidence at trial. D. Construction contends that the circuit court's finding was against the manifest weight of the evidence due as Residori's testimony was uncontradicted. However, "[e]ven where [a party's] testimony in a bench trial was uncontradicted, the trial court [is] not required to give credence to or accept that testimony as establishing any fact in issue." *Gonet v. Chicago & North Western Transportation Co.*, 195 Ill.App.3d 766, 776 (1990). "It is the trial court's prerogative to draw reasonable inferences and ultimate conclusions from the evidence, and

its judgment will not be disturbed because another trier of fact could have found differently or found reasonable other conclusions." *Id.* Further, "[i]t will not suffice to show that the record will support a contrary decision; rather, if the record contains any evidence to support the trial court's judgment, the judgment should be affirmed." *Department of Transportation ex rel. People v. 151 Interstate Road Corp.*, 209 Ill. 2d 471, 488 (2004). As the trier of fact, the circuit court was entitled to give more weight to the admitted evidence, Smolinski's calculations, than Residori's testimony. We cannot say that the circuit court's findings as to the 2017 and 2018 volume discounts were "arbitrary, unreasonable, or not based in evidence." *Wiczer*, 2015 IL App (1st) 123753, ¶ 32.

¶ 129                             E.  Prejudgment Interest

¶ 130        ComEd cross-appeals the circuit court's decision regarding the calculation of prejudgment interest. ComEd calculated prejudgment interest based on the date the awarded sum accrued interest and factored in its setoff rights under the agreements. ComEd contends that the circuit court erred when it held that ComEd waived its argument regarding setoff rights by not raising it during trial. ComEd argues that it raised the issue and the contract between the parties supports its position.

¶ 131        Section 2 of the Interest Act provides:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing ***. In the absence of an agreement between the creditor and debtor governing interest charges, upon 30 days' written notice to the debtor, an assignee or agent of the creditor may charge and collect interest as provided in this [s]ection on behalf of a creditor." 815 ILCS 205/2 (West 2022).

¶ 132        A contract is a written instrument within the meaning of the statute. *Kehoe v. Wildman, Harrold, Allen and Dixon*, 387 Ill. App. 3d 454, 473 (2008). "In order to recover prejudgment interest, the amount due must be liquidated or subject to an easy determination." *Santa's Best Craft,*

*L.L.C. v. Zurich American Insurance Co.*, 408 Ill. App. 3d 173, 191 (2010). An amount is not liquidated when "judgment, discretion, or opinion, as distinguished from calculation or computation is required to determine the amount of the claim." (Internal quotation marks omitted.) *Certain Underwriters at Lloyd's, London v. Abbott Laboratories*, 2014 IL App (1st) 132020, ¶ 71. A disparity between the amount sought and the amount awarded is evidence that the amount is unliquidated. *Vision Energy, LLC v. Smith*, 2025 IL App (3d) 240112, ¶ 93.

¶ 133    The award of prejudgment interest under section 2 of the Interest Act is reviewed for an abuse of discretion. *Certain Underwriters at Lloyd's, London*, 2014 IL App (1st) 132020, ¶ 71. ComEd asserts that as this issue involves the interpretation of both a contract and a statute, the standard of review is *de novo*. See *Abbinanti v. Presence Central & Suburban Hospital Network,* 2021 IL App (2d) 210763, ¶ 15. We conclude that the circuit court erred in awarding prejudgment interest, regardless of the standard of review applied.

¶ 134    ComEd conclusively asserts that "the key issue is when the sums at issue became due under the contract." However, our first question is whether the amounts due were easily ascertainable. 815 ILCS 205/2 (West 2022); *Santa's Best Craft, L.L.C.*, 408 Ill. App. 3d at 191. Here, the amounts due were not easily ascertainable. The central issue at trial how much was owed by either D. Construction or ComEd. Both parties presented testimony and admitted exhibits as to the amounts owed. Both parties reached different conclusions. With regard to its counterclaims, ComEd sought over $2 million in amounts owed. The circuit court entered a judgment that was less than the amount sought. Similarly, for D. Construction's claims, the court awarded significantly less than what it sought. These discrepancies indicate that the amounts due under the Agreements were not easily ascertainable. See *Santa's Best Craft, L.L.C.*, 408 Ill. App. 3d at 191; see also *Lyon Metal Products, L.L.C. v. Protection Mutual Insurance Co.*, 321 Ill. App 3d 330, 348 (2001) ("The large difference between what Lyon claimed in business interruption loss, what Protection Mutual calculated that loss to be, and what the jury ultimately awarded is a strong indication that the sum due pursuant to the business interruption endorsement was not easily determined.").

¶ 135    For these reasons, we find that the trial court abused its discretion in awarding either party prejudgment interest. See *General Dynamics Corp. v. Zion National Bank  Trust Co.*, 86 Ill. 2d 135, 140 (1981) ("[I]t has been held error to allow [prejudgment] interest on an amount due when *** that amount depends largely upon the construction placed on the terms of a contract, and upon questions of fact about which there is room for a difference of opinion."). As we find the court erred in awarding prejudgment interest, we do not need to address ComEd's argument as to whether it was entitled to setoff rights.

¶ 136                                  III.  CONCLUSION

¶ 137    For the foregoing reasons, we affirm the circuit court's order granting dismissal of the defendant's claim for early completion incentives, its order granting partial summary judgment, and its order granting the defendant's motion for directed finding. We also affirm the circuit court's post-trial order. We reverse the circuit court's judgment with respect to prejudgment interest.

¶ 138    Affirmed in part and reversed in part.